**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| **JAVIER TAPIA** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **Case No.: 3:18-cv-899** |
| | ) |
| | ) |
| **MICHAEL RAO,** | ) |
| **President of Virginia Commonwealth** | ) |
| **University, in His Official Capacity;** | ) |
| **NOAH SIMBLIST, in His Official** | ) |
| **And Individual Capacity; and** | ) |
| **SHAWN BRIXEY, in His Official** | ) |
| **And Individual Capacity,** | ) |
| | ) |
| **Defendants.** | ) |

**COMPLAINT**
**(Jury Trial Requested)**

1.      This action is brought under 42 U.S.C. § 1983.  The Plaintiff, Javier Tapia ("Tapia" or "Plaintiff"), is employed with Virginia Commonwealth University ("VCU") as a Professor in the School of the Arts, Department of Painting and Printmaking.

2.      Tapia sues the three named officials of VCU in their official capacity, seeking declaratory, preliminary, and injunctive relief, and attorneys' fees and costs, against those officials, and effectively against VCU, from enforcing a draconian prior restraint against Tapia that prohibits Tapia from entering university property or any of its buildings or facilities, and prohibits him or anybody acting on his behalf from having any contact of any kind with any VCU faculty, staff, or students, including in-person contact, telephone calls, text messages, emails, Facebook, Twitter, or other forms of messaging or social media contacts. While Tapia has named the three VCU

officials in their official capacity as a pleading convention pursuant to the doctrine of *Ex Parte Young*, throughout this Complaint the Defendants are often collectively referred to as "VCU," except where, in context, the naming of specific Defendants is appropriate.

3.    Tapia also sues two of the named officials, Noah Simblist and Shawn Brixey, for money damages, attorney's fees, and costs, arising from their knowing and deliberate violation of Tapia's clearly established constitutional rights of Freedom of Speech, Freedom of Expressive Association, and Due Process of Law.

## JURISDICTION

4.    This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331.

5.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because the Defendant resides in the Commonwealth of Virginia and in the Eastern District of Virginia, and a substantial part of the events giving rise to Plaintiff's claim occurred in this judicial district.

## PARTIES

6.    Tapia is a citizen of the United States of Peruvian origin. Tapia resides in Richmond, Virginia. Tapia is a faculty member in the School of the Arts, Department of Painting and Printmaking at Virginia Commonwealth University.

7.    Michael Rao, sued in his official capacity only, is President of VCU.

8.    Noah Simblist, Chair of the Department of Painting and Printmaking, is sued in his official and individual capacity.

9.    Shawn Brixey, Dean of VCU's School of Arts, is sued in both his individual and official capacity.

**FACTS**

10.     Born in Lima, Peru, in 1957, Tapia studied industrial engineering and communications at the University of Lima during the mid-1970s. In 1979, Tapia came to the United States to study art at Santa Monica College in Los Angeles, California. He has been a Professor at VCU in the School of the Arts, Department of Painting and Printmaking since 1988. He was awarded tenure in 1996. In 2010 he was awarded the Teresa Pollak Award in the Fine Arts category in Richmond, VA. Throughout his tenure at VCU, Tapia has received numerous grants and scholarships and participated in various international and national exhibitions.

11.     Tapia loves his career as artist and educator and has no intention to retire.

12.     On the morning of October 25, 2018, Tapia entered Room 313 in the Fine Arts Building. Room 313 is used for graduate-level seminars, a copy room, and as a lounge area/workspace for faculty and graduate students. It is a secured room requiring a code to enter.

13.     VCU provides the code to Room 313 to faculty (tenured, term and adjunct) and graduate students in the Painting and Printmaking Department.

14.     When Tapia entered Room 313, he saw another person (hereinafter "Professor X") inside. Professor X is a 31-year old adjunct professor who has been teaching at VCU since August of 2018. Although they taught classes within the same university department, Tapia and Professor X did not know each other. Each greeted the other. Neither introduced themselves to the other, and there was no further conversation.

15.     Tapia then left Room 313. His interaction with Professor X lasted a few seconds.

16.     When ten minutes later a VCU security officer entered Room 313 and asked Professor X for some identification, Professor X concluded that Tapia had called security because of her race. She perceived this encounter as racially motivated.

17.     The VCU security guard told VCU officials that Tapia had asked her to check on what he thought was a student in Room 313, which was reserved for faculty.

18.     On October 25, 2018, Professor X filed a complaint of race discrimination with VCU's Equity and Access Services.

19.     On October 26, 2018, Noah Simblist, Chair of the Department of Painting and Printmaking, sent an email to leaders of the School of Arts. Simblist did not identify the parties by name, but he concluded, prior to any investigation, that Professor X had suffered an incident of "racial profiling" and that Tapia had "inappropriately criminalized" her.

20.     On October 28, 2018, Simblist sent an email to staff, faculty and students of the Department of Painting and Printmaking. In the letter, Simblist stated that the senior faculty member "confirmed the basic facts of the situation." Shawn Brixey, Dean of VCU's School of Arts, approved Simblist's letter before Simblist sent it. **Exhibit 1.**

21.     On October 29, 2018, VCU opened a file, assigned a case number (Case # 20181019) and began an investigation of Professor X's complaint.

22.     Between October 29 and November 16, 2018, VCU investigators interviewed witnesses, reviewed documents, conducted a site visit of Room 313, reviewed records of race discrimination at the Integrity and Compliance Office, the University Human Resources/Employee Relations Office, the Office of the Provost, and at the School of the Arts, and conducted other research, including a review of sunrise and weather data to ascertain light conditions in Room 313 on the morning of October 25, 2018.

23.     On November 14, 2018, VCU concluded and informed Tapia that his conduct toward Professor X was not based on her race and/or color. Further, VCU concluded and informed Tapia that there was no evidence that Tapia had mistreated African-Americans or individuals who

are Black at any time during his thirty-year employment at VCU, or that Tapia had treated other individuals who are not African-American or who are not Black more favorably in similar situations. Finally, VCU concluded and informed Tapia that his conduct toward Professor X, regardless of his motive, was not sufficiently severe, pervasive or persistent for a finding of discrimination or a finding of a hostile environment to be made under VCU policy. On November 16, 2018, VCU sent its final report ("EAS Inquiry Results Letter to Prof Tapia") to Tapia by email. **Exhibit 2.**

24.     On November 16, 2018, VCU shared its findings and conclusions with Professor X.

25.     Between October 25, 2018 and November 20, 2018 – and ongoing – due to social media both within the university and external, VCU received a high volume of emails from people expressing concern about what they had heard about racist conduct allegedly perpetrated by Tapia.

26.     For November 15, 2018, students planned a rally in front of the School of Art, demanding that "the old racist" Tapia be terminated.

27.     On November 19, 2018, VCU placed Tapia on administrative leave. While on leave, Tapia has been directed to have no contact of any kind with any VCU faculty, staff, or students. Contact includes in-person contact, telephone calls, text messages, emails, Facebook, Twitter, or other forms of messaging or social media contacts. If Tapia or someone acting on his behalf were to initiate any contact with any VCU faculty, staff, or students in violation of this directive, Tapia may be subject to additional administrative action by the university administration. Tapia is not permitted to visit the campus for any reason. While VCU does not deem Tapia's leave disciplinary in nature, any violation of these terms could lead to formal disciplinary action, up to and including termination from employment. **Exhibit 3.**

28. While Tapia has thus been silenced by VCU, on pains of termination, other members of VCU, including administrators, faculty and students, have been talking freely about Tapia and his alleged racist motives.

29. As described *supra*, Simblist sent two messages that were widely published, concluding, prior to any investigation, that Professor X had suffered an incident of "racial profiling" and that Tapia had "inappropriately criminalized" her, and stating that Tapia had "confirmed the basic facts of the situation."

30. On November 6, 2018, almost the entire faculty of the VCU Arts Department of Painting and Printmaking (PAPR) signed a letter which named Tapia and concluded that Tapia had been guilty of "an act of racial bias" and "implicit prejudice." The letter further attested a "toxic culture of our department." The signatories of the letter asserted that they "stand in support of visiting faculty [Professor X]."

31. Tapia is not listed as teaching at VCU in its roster of available courses for the Spring 2019 semester, clearly indicating that his *persona non grata* status as a professor on the VCU faculty will extend into 2019.

32. Despite efforts by Tapia and his legal counsel to determine how long the prohibition on his entering the VCU campus will last, how long his suspension from teaching will last, how long access to the facilities at VCU through which he engages in his artistic efforts will last, when any hearing or other process explaining the nature of the accusations against him will take place, what opportunities he will have to be heard or participate in whatever proceedings are being undertaken against him, or *any substantive information* whatsoever regarding his status, VCU has absolutely refused to provide Tapia with any information. He has been banished, without explanation, and for all he knows, indefinitely.

## Count I: Violation of First Amendment Rights

### A. Overview

33.     As a tenured member of the VCU Faculty, Tapia enjoys robust First Amendment protection of his free speech rights to engage in public discourse on matters of public interest, including discourse relating to his professional field, as well as all other matters relating to politics, religion, art, science, economics, culture, and all the myriad other matters of general or public concern protected by the First Amendment.

34.     As a tenured member of the VCU Faculty, Tapia enjoys robust First Amendment protection of his freedom of expressive association.  This includes the right to speak to and be spoken to.  It includes the right of interactive discourse with faculty colleagues, students, and other members of the VCU community.  Tapia's freedom of expressive association includes and encompasses his right to speak to others within the VCU community, and listen to the views of others within the VCU community, who wish to speak to him, on matters relating to his professional field, as well as the wide range of other issues of public concern commonly discussed among members of a university community, including matters relating to politics, religion, art, science, economics, culture.

35.     The sweeping ban imposed by VCU on Tapia is breathtaking in its scope.  He has been directed that he is to "have no contact of any kind with any VCU faculty, staff, or students.  Contact includes in-person contact, telephone calls, text messages, emails, Facebook, Twitter, or other forms of messaging or social media contacts."

36.     Tapia is thus banned from posting on Facebook or Twitter a comment for or against President Trump, or American immigration law, or South American politics, or a new art exhibition at a Richmond museum, or a recent statement by the Pope, or *any* statement on *any*

topic of public concern directed to any colleagues on the faculty, staff, students, or anyone else in the broadly defined "VCU community."

37.    The VCU order violates the First Amendment in numerous respects. (1) It operates as a prior restraint on Tapia's freedom of speech and freedom of expressive association. (2) It fails the strict scrutiny test applicable to restrictions on freedom of speech and freedom of expressive association. (3) The VCU policies pursuant to which the order was issued vests a government official standardless discretion to permit or not permit the exercise of First Amendment rights, unlimited in content, scope, or duration; (4) it fails to incorporate the procedural safeguards required under the First Amendment when government officials engage in discretion granting or not granting permission to exercise First Amendment rights.

**B.  The Order Operates as a Prior Restraint**

38.    The order against Tapia operates as an unconstitutional prior restraint.  Any exercise by Tapia of his freedom of speech rights or his freedom of expressive association rights with his colleagues, students, staff members, or other members of the VCU community is forbidden.  The directive states in no uncertain terms: "If you or someone acting on your behalf initiates any contact with any VCU or VCU faculty, staff, or students in violation of this directive, you may be subject to additional administrative action by the university administration."  The order hangs like a sword of Damocles over Tapia's First Amendment freedoms.  Dare he talk or be talked to, he may be terminated.  The order thus recites: "should you take any action in conflict with the terms of this paid administrative leave including the communication restrictions, your leave status may be changed to leave without pay and you may be subject to formal disciplinary action, up to and including termination from employment."

39.     There is no greater offense to the First Amendment than a prior restraint.    Prior restraints bear a heavy presumption against their constitutional validity." Prior restraints upend core First Amendment principles because a free society prefers to punish the few who abuse rights of speech after they break the law rather than to throttle them and all others beforehand.

### C.  The Order Fails Strict Scrutiny

40.     The sweeping prohibition issued by VCU plainly triggers the First Amendment strict scrutiny standard, requiring that the VCU order must be narrowly tailored to promote a compelling government interest and use the least restrictive means available to effectuate its interest.

### 1.  There is No Compelling Interest Commensurate with the Sweep of the Ban

41.     Because VCU has stonewalled in refusing to provide Tapia with any useful information regarding the rationale for its draconian restriction on Tapia's First Amendment rights, he may only speculate on what "compelling" governmental interest, if any, VCU might proffer to justify its extraordinary ban.  To the extent that the ban has been issued against Tapia for the fleeting minutes of activity in Room 313 with Professor X, his subsequent brief interaction with a VCU security officer, there is no conceivable compelling governmental interest that VCU might plausibly assert for the sweeping prohibition on Tapia's freedom of speech and freedom of expressive association with regard to the virtually infinite array of other topics of public concern on which Tapia might engage, or be engaged, with faculty members, staff members, or students at VCU.  Whatever did or did not transpire in Room 313 cannot conceivably be invoked by VCU to prevent Tapia from a Facebook or Twitter interchange with a colleague on unrelated issues of politics, religion, art, or science.  No conceivable compelling interest commensurate with the scope of the ban on Tapia's First Amendment rights can possibly exist.

## 2. The Ban Fails the Narrow Tailoring Requirement

42.     Even if, for the sake of argument, it were posited that VCU possesses some compelling basis for *some* restriction on Professor Tapia's free speech rights and rights of expressive association, the VCU order would fail the narrow tailoring prong of the strict scrutiny test.  The order, as written, is as far from "narrow tailoring" as any order issued by any government official that could ever be imagined.  The VCU directive is an exemplar of "anti-narrow-tailoring." Tapia does not contest here that an order surgically narrowed to accomplish precise governmental interests may be permissible under the First Amendment.  An order instructing a litigant to refrain from retaliation, or obstruction of justice, or illicit influence of witnesses, are examples.  But Tapia has not been told to avoid contact with Professor X, or with the security officer on duty.  He has been instructed to avoid all communication on all topics in all forums in American society with members of the VCU community.  This is manifestly not narrow tailoring, nor the use of the least restrictive means.

43.     Thus, even if it were posited, for the sake of argument, that somehow VCU has a compelling governmental interest in restricting Tapia's speech and freedom of expressive association arising from the incident involving Professor X, the prior restraint ban on Tapia talking to persons not involved with the incident would be content-based and presumptively unconstitutional.  Prior restraints preventing litigants from commenting to outsiders, such as the press or public, on the merits of judicial or other governmental proceedings are presumptively unconstitutional and almost always struck down.  While First Amendment law does recognize limited small windows of restraints that may be imposed during the pendency of governmental proceedings on direct participants, even those restraints are routinely subjected to rigorous First Amendment review and overturned.  Yet VCU has not even pretended to so limit its all-

10

encompassing restraint on Tapia.  He has not been prohibited from engaging in witness-tampering, or retaliating against Professor X.  Indeed, the gag against his First Amendment rights does not purport to be limited even to the *subject matter* of the incident regarding Professor X.

44.     Setting aside the possibility that some narrowly tailored restrictions on Tapia's communication with direct participants in the investigation, such as percipient witnesses or hearing decision-makers, or Professor X, could be constitutional, plainly anything beyond that is highly suspect under the First Amendment.

45.     Tapia does not concede that the First Amendment would allow VCU to issue an order prohibiting Tapia from discussing the incident with Professor X with others in the VCU community.  Tellingly, VCU *has not* issued any directive prohibiting any member of the VCU community from engaging in public discourse excoriating Tapia. No students, faculty members, or administrators have been warned or threatened with sanctions for labeling Tapia a racist.  Even the worst offender, Noah Simblist, has not been placed on administrative leave, has not been issued any order instructing him not to discuss the Tapia matter with anybody else on the VCU campus, and has not been ordered to cease and desist his attacks on Tapia as someone who engaged in racial profiling and the criminalizing of a fellow human being based on the color of her skin, despite VCU's own investigatory conclusions that such accusations are false.  The goose and the gander are clearly not being treated equally by VCU.  Others in the VCU community are free to talk about the incident involving Tapia and Professor X to their heart's content.  Tapia alone is not.  Thus even if VCU were to offer up as its compelling governmental interest, its interest in preserving the integrity of its adjudicatory proceedings, or preventing retaliation, the sweeping ban on all general discussion of the event by Tapia would violate the First Amendment.  VCU's ban, of course,

extends far beyond discussion of the incident, as already explained.  But even were it limited to any general discussion of the incident (which it is not), it would violate the First Amendment.

### D.  VCU Has Vested Unconstitutional Standardless Discretion in its Officials

46.    The ban restraining Tapia's enjoyment of his rights of freedom of speech and expressive association utterly chills his expression.  If he engages in any of the activity encompassed by the ban that is protected by the First Amendment, the sword may fall.  His only way to escape potential liability would be to petition Dean Brixey, or some other official for advance dispensation to enter the VCU campus or engage in discourse on matters of public concern with any member of the VCU community.

47.    The guarantee of freedom of speech afforded by the First Amendment is abridged whenever the government makes enjoyment of protected speech contingent upon obtaining permission from government officials to engage in its exercise under circumstances that permit government officials unfettered discretion to grant or deny the permission.

48.    The First Amendment strongly condemns vesting in government officials standardless discretion to determine when the exercise of First Amendment freedoms shall and shall not be permitted.  VCU's polices and procedures lack any coherent standards for determining when University officials may act to completely stifle the free speech and free expressive association rights of University faculty.  Indeed, it does not appear as if any of the government officials responsible for the wrongs done to Tapia, including Professor Simblist or Dean Brixey, were guided by policies narrowly tailoring the exercise of their discretion as government officials censoring speech and free association.  To the contrary, it appears that these two government officers exercised free-wheeling discretion, shooting from the hip in deciding for themselves that they could condemn Professor Tapia and indiscriminately ban him from engaging in his First

Amendment rights without in fact employing, let alone articulating, any pre-existing narrowly-tailored standards limiting the exercise of their discretion pursuant to content-neutral and viewpoint-neutral standards, as required by the First Amendment.  Indeed, quite the contrary, the extant facts strongly suggest that both of these government officers were motivated by illicit content-based and viewpoint-based animus against Professor Tapia.  The First Amendment prohibition on the exercise of standardless discretion by government officers exists precisely to interdict the infection of government decision-making restricting First Amendment rights by such bias.

**E.  The VCU Ban Lacks the Procedural Safeguards Required by the First Amendment**

49.     VCU cannot vest discretion in its officials to restrain the exercise of protected First Amendment activity without imposing adequate standards for VCU officials to apply in rendering a decision to grant or deny permission to engage in that constitutionally protected activity.  The First Amendment requires, at minimum, that (1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court.

50.     VCU has completely abdicated its constitutional obligation to abide by such safeguards.  Tapia has been restrained for an indefinite period, with no procedural mechanism in place for either prompt internal administrative or appropriate judicial review.  Tapia has instead been forced by VCU's inveterate stonewalling to seek judicial review on his own, by filing this action.  VCU's failure to provide procedural safeguards voids its restraint.  VCU, moreover, bears the heavy burden of justifying this extraordinary abuse of power by its officials once in court.

## Count II: Violation of the Void for Vagueness Doctrine

51.     Under the Due Process Clause of the Fourteenth Amendment, it is a basic principle that prohibitions of speech or conduct are void for vagueness if those prohibitions are not clearly defined.  A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required.

52.     VCU's issuance of the no trespass order banning Tapia from the VCU campus, and the accompanying ban prohibiting his communicative activity with all members of the VCU community, which amounts to a "uber-no-trespass" order extending beyond VCU's physical space into cyber-spaces and social media such as Facebook and Twitter, was based on standards that are unconstitutionally vague.

53.     Courts have held that the no-trespass orders of universities and schools are subject to the void-for vagueness doctrine.  Decisions to forbid persons from entry to campus grounds cannot be based on vague standards that lack clearly defined notice of the conduct or speech that will trigger the prohibition.

54.     The void for vagueness doctrine applies with special rigor in free speech cases, because when speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech.

55.     VCU's severe action against Tapia cannot withstand a void-for-vagueness attack. Nothing in VCU's standards and procedures provided Tapia with anything remotely close to reasonable notice as to what conduct or speech by Tapia would leave to a ban as punishing as that visited upon him.  Particularly as applied to the restrictions on his freedom of speech and freedom of expressive association, VCU's actions are unconstitutionally vague and void.

### Count III: Violation of Procedural Due Process

#### 1. The Two-Part Procedural Due Process Inquiry

56.      Tapia's procedural due process claim poses a two-part inquiry.  He must first establish the deprivation of a "property interest' or "liberty interest" cognizable under the Due Process Clause of the Fourteenth Amendment.  Tapia has two bites at this apple—either a property interest or a liberty interest will do.  In this Complaint Tapia asserts a cognizable property interest, and two independently cognizable liberty interests.  As long as at least one of these proffered interests is deemed valid at the pleading stage by the Court, Tapia has stated a threshold procedural due process claim.

57.      Once Tapia establishes the existence of either a property interest, a liberty interest, or both, the Court must determine whether VCU has provided Tapia with sufficient due process prior to the deprivation.  This inquiry into "how much" process is due entails a balancing of factors.  The Court must assess the weight of Tapia's private interest that will be affected by VCU's action; the Court must weigh the risk of an erroneous deprivation of Tapia's interest through the procedures VCU used; the Court must assess the probable value, if any, of additional or substitute procedural safeguards; and finally, the Court must assess VCU's interest, including the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

#### 2. Tapia has been Deprived of Property Interest

58.      Tapia alleges that the complete banishment of a tenured university professor from a campus, the stripping of the professor's teaching opportunities, the denial to the professor of the facilities through which the professor conducted his scholarly activity (in Tapia's case, his art), and the complete segregation of the professor from any contact with colleagues, students from any and all communicative activity, constitutes a sufficiently deep dent into the bundle of rights that

comprise the totality of the property interest that is defined by tenure at a state university in Virginia to trigger the protections of the Due Process Clause.

59.     Tapia has not been stripped of his paycheck.  VCU will predictably argue that as long as it continues to pay Tapia, and as long has he has not been outright fired, he has not been deprived of a property interest under Virginia law.

60.     The definition of tenure at Virginia's state universities, however, is perfectly aligned with the definition of tenure as defined within the highest traditions and practices in American higher education.   Tenure is not a sterile right to a lifetime paycheck.   Tenure contemplates reciprocal rights and responsibilities between the professor and the university.   As acknowledged by VCU's own policies on tenure at its core tenure exists to ensure and enshrine values of "academic freedom of thought, learning, inquiry, and expression," as well as "[f]air and equitable treatment for all individuals."

61.     For a professor who has been tenured since 1996 to suddenly be banned from his classroom, banned from his office, banned from his artistic spaces, denied use of his computer, banned of all congress with his colleagues and students, is to eviscerate the very soul of the property interest that tenure protects.  In the words of Justice Oliver Wendell Holmes, a "man, like a tree in the cleft of a rock, gradually shapes his roots to his surroundings, and when the roots have grown to a certain size, can't be displaced without cutting at his life." Oliver Wendell Holmes, *Letter to William James, April 1, 1907, in* THE MIND AND FAITH OF JUSTICE HOLMES: HIS SPEECHES, ESSAYS, LETTERS AND JUDICIAL OPINIONS 417-18 (Max Lerner ed., 1946).

62.     Courts in the Fourth Circuit and nationwide have recognized that whether a change in employment status does or does not rise to the level of deprivation of a "property interest" requires case-by-case analysis of the severity of the deprivation as measured against the

16

entitlement created by contract or positive regulatory statute, policy, or practice. Certainly no tenured faculty member at VCU, or tenured faculty member at VCU or other estimable American universities nationwide, would regard their banishment from campus, classroom, and colleagues as anything other than a major deprivation of the property interest they acquired upon being granted tenure.

63. The entire point of tenure is insurance against arbitrary and capricious encroachment on the faculty member's life of the mind. The core of the bargain is that the essential privileges and duties of a faculty member, encompassing teaching, research, and service, shall not be deprived by administrative fiat or whim. It would violate the entire essence of the bargain that tenure contemplates to treat it merely as a guarantee that the "university will keep paying you, but you will be denied access to the laboratory, the library, the classroom, and any interaction with faculty, staff, or colleagues."

64. The banishment of Professor Tapia constitutes a dramatic and substantial alteration of the terms of his tenure contract with VCU. As applied to the traditions and customs of tenure nationwide, as they inform the nature of the property interest VCU has conveyed to its tenured faculty members upon their receipt of tenure, VCU's actions clearly triggered the requirement that Tapia not be summarily stripped of the core substantive elements of tenure without being provided due process of law

### 3. Tapia Has Been Deprived of First Amendment Liberty Interests

65. A fundamental right, enumerated or unenumerated, that is protected under the Bill of Rights, automatically qualified as a "liberty interest" that may not be deprive under the Fourteenth Amendment's Due Process Clause without due process of law.

66.     In Count I of this Complaint, Tapia argued that the actions taken against him implicate his rights of freedom of speech and freedom of expressive association protected under the First Amendment.   Those fundamental First Amendment rights, explicit under the First Amendment under the Free Speech Clause, and also recognized (partially in explicit terms and partially through implicit elaboration) under the fundamental right of freedom of expressive association, *automatically* qualify as "liberty interests" protected under the Fourteenth Amendment Due Process Clause.   Tapia's procedural due process claim on this point may seem undisguisable from his First Amendment claim, but the two claims are not in fact duplicative. Each stands on its own bottom.   Bill of Rights guarantees are virtually never absolute.   To the extent that VCU may assert that Tapia has somehow forfeited the Bill of Rights guarantees to freedom of speech or freedom of expressive association that he would otherwise enjoy, Tapia is entitled under the *independent operation of the Due Process Clause* to an appropriate hearing on the merits of the *factual underpinnings* of any assessment by VCU that his First Amendment rights have been forfeited.

67.     In short, because the ban on Tapia manifestly implicates rights he possesses under the First Amendment, it was incumbent on VCU not to undertake any action encroaching on those rights without first according Tapia due process of law.

### 4.  Tapia Has a Valid "Stigma Plus" Due Process Claim

68.     VCU officials have branded Tapia a racist who engaged in racial profiling of Professor X, criminalizing her presence in Room 313 because of the color of her skin.   To brand Tapia as a racist is to effectively administer the academic death penalty to Tapia.   The branding has already been enough to cause VCU to banish Tapia from all academic and collegial life at the University.   Tarnished with this stigma, no university in America is likely to ever higher him.

18

Tapia has been rendered hopelessly damaged goods, whom no American university will ever likely be willing to employ.

69.     It has long been settled law that a liberty interest is implicated where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him.  Under what courts have come to call the "stigma plus" test, a liberty interest sufficient to sustain a procedural due process claim vests in an individual when government officials stigmatize a person by publicly impugning his or her reputation, accompanied by some additional alteration of the person's legal rights or status.

70.     The "stigma" part of the test is akin to defamation.  Courts have recognized that the stigma requirement is satisfied by statements disclosed to the public that impugn a person's fitness or character in relation to his or her profession, or imply the existence of a serious character defect such as dishonesty, unethical conduct, or immorality.  The public statements made by Simblist that were clearly understood by the community as targeting Tapia and accusing him of "racial profiling" with regard to Professor X and having "inappropriately criminalized" Professor X fall squarely within the core of the "stigma" required to support a liberty interest under the Due Process Clause.

71.     The proof that Tapia was stigmatized by Simblist is most clearly demonstrated by an avalanche of attacks on Tapia accusing him of being a racist as a result of Simblist's public statements.  Tapia has been flooded with vicious attacks on social media, as well as attacks from his colleagues at VCU, from non-profit organizations, including the Virginia ACLU, and from other academics around the nation.

72.     The "plus" component of the "stigma plus" test does *not* require deprivation of an interest that would qualify as a "property interest" under the Due Process Clause.  If the "plus"

element required a formal property interest, the "stigma plus" test would be superfluous, because in any case in which a "plus" sufficient to support a "stigma plus" "liberty interest" claim would automatically already have qualified as sufficient to support a "property interest" claim.  The "plus" in the "stigma plus" test may thus be satisfied by less severe alterations in a plaintiff's status that might not rise to the level of deprivation of a property interest.

73.     Tapia has suffered at least two alterations of his status sufficient to satisfy the "plus" requirement.  First, the limitations on his free speech and freedom of expressive association rights are the sorts of deprivation that have long been recognized as sufficient "plus" to satisfy the "stigma plus" test.  Second, the stripping of his teaching responsibilities, the denial of his right to enter the VCU campus, the deprivation of his access to office, classroom, computer, and other "tools of the trade" of his work as an artist and teacher are dramatic alterations of his status as a tenured professor.

### 5.  Tapia Has Been Provided No Due Process

74.     Once it is accepted that Tapia has either a property or liberty interest at stake, the violation of the Due Process Clause automatically follows.  Tapia has been provided *zero* due process.  There was, to be sure, an investigation of the incident involving Professor X, in which Tapia participated.  But *that* investigation reached closure, with Tapia's exoneration of all charges suggesting that his suggestion to the security officer was motivated by racial animus.  VCU's conclusion that Tapia was *not* a racist in relation to Professor X could not have been more definitive:

> What this evidence does not demonstrate is that you initiated the security check based on Professor [X]'s race and/or color. You did not overtly do or say anything that demonstrated that his decision to contact security was due to Professor [X]'s protected identities. The inquiry did not stop there, however. During the inquiry, EAS asked about any prior complaints against you which may indicate hostility toward a protected group, searched its records and also contacted all of the other

university offices likely to have received such complaints (SOTA, Office of the Provost, Human Resources, Integrity and Compliance Office). The Department Chair and you denied any prior complaints, and no such records were located by EAS or any of the other contacted university offices. SOTA also reviewed student course evaluations for any concerns raised about discriminatory treatment by you, and no such concerns have been identified.

Additionally, due to social media external to the university about the incident, EAS and SOTA both received a high volume of emails from people expressing interest in this matter and concerns about the climate and culture in PAPR, SOTA and/or VCU generally. None of these emails provided specific information about incidents involving you. In response to any emails making general reference to other incidents or related behaviors, EAS and SOTA invited the senders to provide additional information. No such additional information was received.

Similarly, there was no evidence that you treated other individuals who are not African-American or who are not Black more favorably in similar situations.

Rather, the evidence provided by the Security Officer that you asked her to check on a student constitutes a nondiscriminatory, valid reason for his decision to initiate the check in light of the policy limiting room use to faculty and graduate students. Whether your initiation of the security check, absent evidence that it was discriminatory, was reasonable or warranted under the circumstances is outside EAS's scope to determine. Professor [X] also noted to the investigator that she has been mistaken for a student elsewhere based on her "youthful appearance".

75.     The VCU Report sent to Tapia brought closure to the matter, explaining to Tapia

that no additional inquiry or action against him by VCU was warranted:

At this time, unless additional information is received, the EAS inquiry with administrative review is now concluded and no further action will be taken through the EAS investigation and resolution process.

76.     This communication from VCU, appropriately exonerating Tapia of any racist

motivation, was a welcome vindication of Tapia.  The truth had prevailed, and Tapia was able to

breathe a sigh of relief.

77.     Then, without warning, without any additional due process, without explanation of

any kind, the axe fell, as Dean Brixey issued his extraordinary letter to Tapia with its extreme

sanctions.  The utter lack of any due process in the interregnum between Tapia's exoneration and

the issuance of the ban by Dean Brixey is contrary to all norms of academic integrity in American higher education, and utterly inexplicable.  If new evidence against Tapia was received by VCU in interval between his exoneration and his subsequent punishment, he deserved the full measure of process due under the Fourteenth Amendment balancing test, including at minimum a explanation of the new charges, or new evidence, and an opportunity to be heard.

78.    What Tapia instead received was nothing less than a Kafkaesque stonewalling.  He was suddenly banished, with no due process whatsoever.

79.    VCU made Tapia a scapegoat.  To appease the students and faculty members who were wrongfully calling for Tapia's dismissal from the University by branding him a racist—a chorus fed in large part by the actions of VCU officials such as Professor Simblist and Dean Brixey themselves—VCU issued its draconian ban infringing on Tapia's constitutional rights. Scapegoating that extends to muzzling an individual from the exercise of rights of freedom of speech and freedom of expressive association is a violation of the First Amendment. Scapegoating is the antithesis of due process of law and the rule of law.

**RELIEF SOUGHT**

80.    Tapia seeks declaratory and injunctive relief, temporary and permanent, against all Defendants sued in their official capacity (and thus, effectively, against VCU itself), requiring VCU to immediately lift the ban, fully restoring Tapia to all the rights and privileges of a tenured professor at VCU.  Tapia will be filing a separate Motion for a Preliminary Injunction, with supporting material and a supporting Memorandum of Law, in addition to this Complaint.

81.    To the extent that VCU may claim some residual compelling interest in preventing Tapia from retaliating against Professor X, or otherwise preserving the integrity of any ongoing investigatory processes, this Court has inherent equitable power to shape a temporary or permanent

injunction to include any narrowly tailored carve-out, should VCU prevail in meeting its heavy burden justifying such a carve-out, while still enjoining VCU from otherwise enforcing its sweeping ban against Tapia.

82.    Tapia also sues two of the VCU officials, Simblist and Brixey, in their individual capacities, seeking money damages against them for violation of Tapia's constitutional rights of freedom of speech, freedom of expressive association, and due process of law.  Tapia seeks one million dollars in compensation against Simblist and Brixey, jointly and severally, for those constitutional violations.  Tapia's rights of freedom of speech and freedom of expressive association, as well as his right to procedural due process, were well-established law at the time of the violations committed by Simblist and Brixey, in the specific context of the academic setting at VCU and the rights of a tenured professor at a public institution such as VCU.

83.    Tapia seeks attorneys' fees and costs against all Defendants, should Tapia be a prevailing party, as provided under 42 U.S.C. § 1988.

**TRIAL BY JURY IS REQUESTED.**

**JAVIER TAPIA**
By Counsel


_____/s/  Tim Schulte_____
Blackwell N. Shelley, Jr. (VSB # 28142)
Tim Schulte (VSB # 41881)
Shelley Cupp Schulte, P.C.
2020 Monument Avenue, First Floor
Richmond VA  23220
(804) 644-9700
(804) 278-9634 [fax]
shelley@scs-work.com
schulte@scs-work.com


_____/s/_____
Timothy E. Cupp (VSB # 23017)
Shelley Cupp Schulte, P.C.

23

1951 Evelyn Byrd Avenue, Suite D
Harrisonburg, VA  22803
(540) 432-9988
(804) 278-9634 [fax]
cupp@scs-work.com

_____/s/_____
Rodney A. Smolla (VSB # 32768)
4601 Concord Pike
Wilmington, Delaware 19803
(864) 373-3882
(804) 278-9634 [fax]
rodsmolla@gmail.com

*Attorneys for Plaintiff*