IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JAVIER TAPIA,

                Plaintiff,

v.

MICHAEL RAO,
President of Virginia Commonwealth
University, in His Official Capacity;
NOAH SIMBLIST, in His Official and Individual
Capacity; and SHAWN BRIXEY, in His Official
and Individual Capacity,

                Defendants.

Civil Action No. 3:18-cv-899

**MICHAEL RAO, NOAH SIMBLIST and SHAWN BRIXEY'S MEMORANDUM IN
SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants, MICHAEL RAO, President of Virginia Commonwealth University, in his official capacity ("Rao"), NOAH SIMBLIST, in his official and individual capacity ("Simblist"), and SHAWN BRIXEY, in his official and individual capacity ("Brixey") (collectively, "VCU Defendants"), respectfully submit this memorandum in support of their motion for summary judgment, based on claims of Eleventh Amendment Immunity and qualified immunity, among other bases, for dismissal of the Complaint filed by Javier Tapia ("Plaintiff" or "Tapia"), pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.

PRELIMINARY STATEMENT

Rao, Brixey and Simblist acknowledge that this Court is familiar with the background facts of this case based on previous pleadings, including a recent round of briefs on Plaintiff's Motion for a Preliminary Injunction. The issues raised in the instant motion, however, are not based on an exhaustive recounting of facts, but rather, are based on a set of narrow, yet material, undisputed facts. These facts are sufficient to establish as a matter of law that the claims asserted against Rao, Brixey and Simblist in their *official capacities* are not subject to the *Ex parte Young* exception. As Rao, Brixey and Simblist are entitled to the sovereign immunity established by the Eleventh Amendment to the U.S. Constitution, the claims asserted against them in their *official capacities* should be dismissed.

These facts further establish that Brixey and Simblist are entitled to qualified immunity on the claims asserted against them in their *individual capacities*.[1] Simblist – who played no role in the decision to place Tapia on administrative leave – did not take any action that violated well-established constitutional rights, under the First or Fourteenth Amendments. Also, Brixey was not involved in the interaction in the Painting and Printmaking Department ("PAPR") on the morning

---

[1] No claims have been asserted against Rao in his individual capacity.

of October 25, 2018, the subsequent Inquiry conducted by VCU's Equity and Access Services. Nor did he send the October 26, 2018 email that allegedly identified Tapia as someone that engaged in "racial profiling" and/or whom had "criminalized" a visiting professor in the PAPR faculty.  Further, Tapia cannot show that Brixey, by placing Tapia on a temporary, non-punitive, paid administrative leave during which the restrictions were limited to work-related activates, violated any of Tapia's clearly established First or Fourteenth Amendment rights.

These facts also establish that the administrative leave described in the Complaint was lifted over four months ago (more than two months before this Court's Initial Pretrial Conference) and Tapia was restored to all the rights and privileges of a tenured professor at VCU, all of which Tapia conceded at his deposition. They show further that prior to the filing of the Complaint, Tapia did not request a "name-clearing" hearing, nor did he object to or seek to provide any information or documentation to refute the conclusions set forth in Brixey's letter dated February 15, 2019 or in response to written findings produced at the conclusion of the EAS Inquiry.  Finally, these facts show that Tapia was not terminated, demoted, or otherwise subjected to the kind of deprivation that would establish the basis for the due process claims set forth in Count III.

For these and the reasons set forth in more detail below, Rao, Brixey and Simblist respectfully move for summary judgment and request that this Court dismiss the Complaint. Further, because this motion presents issues of sovereign immunity and qualified immunity, which are jurisdictional bars to proceeding, Rao, Brixey and Simblist request that this Court stay any further proceedings until these matters can be addressed.

I.    STATEMENT OF UNCONTESTED MATERIAL FACTS

    A.    FACTS RELEVANT TO THE RELIEF SOUGHT IN COMPLAINT

    1.      In the Complaint filed by Tapia in this matter on December 28, 2018, under the

section that reads "Relief Sought," Tapia requests declaratory and injunctive relief, temporary and permanent, against all Defendants sued in their official capacity (and thus, effectively, against VCU itself), requiring VCU to [1] immediately lift the ban, [2] fully restore Tapia to all "the rights and privileges of a tenured professor at VCU."

2.     The administrate leave or "ban," as that term is referred to in the Complaint, has been lifted.[2]

3.     Tapia has been fully restored all "the rights and privileges of a tenured professor at VCU." [3]

4.     Tapia is listed on the current roster to teach at the PAPR when classes at VCU resume in Fall 2019.[4]

5.     Prior to the filing of the Complaint, Tapia did not request a "name-clearing" hearing.[5]

6.     Tapia is not aware of any fact that would show that Simblist, Rao or Brixey are currently violating his rights or are about to do anything that would violate his rights.[6]

B.     BACKGROUND FACTS

7.     On October 25, 2018 at 9:00 a.m., Caitlin Cherry ("Cherry") posted to a closed group of friends on her Facebook page.  This closed group did not include any VCU students or faculty; it did include, however, Elizabeth Axtman ("Axtman"), a personal friend of Cherry that has no affiliation with VCU.  That post stated, in part:

> at about 8:30 am Im sitting in the VCU adjunct faculty lounge/seminar room with my laptop . . . An older white gentleman comes in and looks confused all of a

---

[2] Tapia Deposition II, pages 7-8.
[3] Tapia Deposition II, page 8.
[4] Tapia Deposition, page 139.
[5] Tapia Deposition, page 193-94.
[6] Tapia Deposition, page 249-51.

sudden, and I say hello and he leaves.  Less than 5 minutes later security comes into the office to ask for my ID asking if I'm faculty.  I'M IN MY OWN CLASSROOM. . . . I am sitting here fuming because of I've felt this a million times but never seen it so egregiously on display by another faculty member of my own damn department.  I know his name. And he should be ashamed and shamed."[7]

8.      Axtman, who is known on Instagram as "Bad News Women" or "@badnewswomen," used the information from Cherry's private Facebook posting and created a "Baddie Alert" for her public Instagram page, which according to Tapia "set off the social media wildfire."[8]  That post, which can still be found on the Bad New Women Instagram page, states:

Baddie Alert

So, old timer white professor #JavierTapia, called security on the hilarious, brilliant artist and professor Caitlin Cherry . . . Because she did nothing more than be black and young in his vicinity. If you feel inclined and I hope you do writing VCU about this incident here's the email addy equity@vcu.edu.  Or maybe you prefer a more direct correspondence you can reach dialacop at jtapia@vcu.edu.  Baddies do your thang . . . . . . #VCU.

9.      As acknowledged by Tapia, this story post went viral on the morning of October 26, 2018, having caught the attention of, among others, Rebecca Solnit ("Solnit"), a national author, human rights activist, and contributing editor at Harper's Magazine.

10.      In the meantime, Cherry sent an email to Simblist and equity@vcu.edu, the general email for Equity and Access Services, on October 25, 2018 at 10:06 a.m.[9]  Cherry stated in that email, "I want to inform you about an incident this morning that I'm also planning to relay to HR." Cherry went on to state, among other things, that:

While the incident seems minor it rather upset me because of its undertones. It's a feeling I'm unfortunately familiar with, but have never seen it play out so

---

[7] A copy of Cherry's private Facebook post is attached as Exhibit 1; see also Tapia's written statement to the EAS, which includes the Bad News Women post, attached as Exhibit 2.

[8] *See* Exhibit 2. Tapia's written statement, which includes his assertion that the Bad News Woman post "set off the social media wildfire," recounts further how between October 25, 2018 and October 29, 2018 he had "been pilloried on social media, received threating emails, lost both of my graduate student TAs, and seen attendance in my classes drop by 60 percent."

[9] A copy of Cherry's email to Simblist dated October 25, 2018 attached as Exhibit 3.

formally/aggressively with someone within the same department. . . . I am quite offended I'm usually not one to report such things, but it would just like to feel comfortable in the limited spaces I have access to around here.

11.     On the following day, on October 26, 2018 at 3:10 p.m., Simblist forwarded Cherry's email to five VCU administrators, explaining, "in his opinion," what he understood to have happened on the previous morning.[10] Simblist's email was not sent to any other office, shared with any other PAPR faculty, PAPR student, VCU student, third party, or posted on any website, public or private.[11]

12.     Two days later, on October 28, 2018, Simblist sent an open letter to PAPR students, faculty and staff, confirming generally – but without using names -- that there had been an incident where a "senior faculty member encountered an adjunct visiting professor in Room 313 – a room typically used as an adjunct co-working space and seminar room.  They did not talk to the adjunct but contacted FAB Security.  Security asked for their VCU ID, determined that they were a faculty member, and left."  Simblist stated further that the appropriate offices have been contacted that the complaint is being taken seriously.[12]  Tapia testified that he has no evidence that Brixey played a role or approved the text  of that letter.[13]  He also testified that this letter was fairly correct and that additional facts could have been included.[14]

13.     On Monday, October 29, 2018, EAS opened an Inquiry and Administrative Review, the purpose of which was to consider whether Tapia's initiation of a security check on Cherry on the previous Thursday constituted a violation of VCU's Preventing and Responding to

---

[10] A copy of Simblist's email dated October 26, 2018 is attached as Exhibit 4.
[11] Simblist Declaration, paragraph 7; Tapia Deposition, page 136-37.
[12] Simblist Declaration, at paragraph 8.
[13] Tapia Deposition, page 186.
[14] Tapia Deposition, page 245-247

Discrimination Policy.[15]

14.     EAS concluded its administrative review and on November 14, 2018 met with Tapia and his attorney, Tim Schulte, to summarize the results of its Inquiry.  EAS also provided Tapia a written report reflecting the results of its Inquiry in its letter dated November 16, 2018.[16] In that letter, the EAS confirmed to Tapia that the evidence it had collected – taken in the light most favorable to Cherry – did not demonstrate that Tapia had initiated the security check based on Cherry's race and/or color and did not establish that Tapia had violated the Preventing and Responding to Discrimination Policy.  It stated, however, that EAS was recommending that the Office of the Provost and other university offices be consulted "to determine whether the Findings of Fact in this matter indicate a potential violation of other university policies or codes of conduct."[17]

15.     On the evening of November 19, 2018, Brixey notified Tapia by letter that he was placing Tapia on paid, non-punitive leave. In addition to setting forth the terms of the administrative leave, that letter invites Tapia to contact Brixey if Tapia had any questions about the leave.[18]

16.     Simblist played no role in the decision to place Tapia on administrative leave, nor was he involved in or consulted on the terms of that leave.[19]

17.     On the following day, Tapia, through his attorney Schulte, reached out by phone to VCU counsel Jacob Belue ("Belue"), who was also present for the November 16, 2018 meeting at

---

[15] Complaint, paragraph 21; see also EAS Inquiry Letter regarding Case #20181019, dated November 16, 2018, attached to the Complaint as Exhibit 2.
[16] See EAS Inquiry Letter regarding Case #20181019, attached to the Complaint as Exhibit 2.
[17] The EAS report of its findings and recommendations, dated Nov. 16, 2018, attached to the Complaint as Exhibit 2.
[18] Brixey Declaration, at Exhibit A (Letter of November 19, 2018).
[19] Brixey Declaration II, paragraph 3.

EAS.  When Belue responded to that call, Schulte asked for a "clarification" of the administrative leave letter and said, among other things, the letter appeared to restrict Tapia from all contact with anyone affiliated with VCU suggesting that Tapia would not be able to have Thanksgiving dinner with VCU colleagues.[20]

18.     In response to Schulte's request for a clarification, Belue stated that the administrative leave restriction only related to work-related contact with VCU faculty, staff or students and the leave did not prohibit social interactions or having non-worked related contact with anyone affiliated with VCU.[21]

19.     During that call, Belue also explained the need and basis for this leave, reminding Schulte that EAS had concluded that Tapia had provided information to EAS that was at best not credible and that his failure to know the identity of someone in his own department or introduce himself to Cherry on October 25, 2018 instead of initiating a security check had caused a significant disruption in the PAPR.  Belue also confirmed that other individuals were coming forward with additional incidents or claims of bias or discrimination involving Tapia.  Belue told Schulte that it was for all of these reasons, which VCU had an obligation to review, and because VCU had an interest in bringing stability to an escalating situation and keeping Tapia and VCU from experiencing further disruption, that Tapia had been placed on the administrative leave.[22]

20.     Schulte accepted this clarification but said he would need some form of written confirmation.  Belue said he would speak with Brixey and get back to Schulte shortly.[23]

21.     Schulte thereafter confirmed, via email dated November 20, 2018 at 3:30 p.m, that

---

[20] Schulte's exchange with Belue, attached to Belue's Declaration, at Exhibit A (Emails dated November 20, 2018).
[21] *Id.*
[22] Belue Declaration, paragraph 5.
[23] Belue Declaration, paragraph 6.

he needed written confirmation of the clarification and threatened to file a Motion for a Restraining Order if he did not get this confirmation within the hour.[24]

22.     At 3:42 p.m., after speaking with Brixey, Belue provided written confirmation of his discussions with Schulte, confirming that he had spoken with the Dean and that per their previous discussion, the letter should only be read to curtail work related activity.  Belue wrote that he would be happy to discuss the matter further if Schulte still had any questions.[25]

23.     Tapia, through Schulte or directly, did not seek further clarification on the information that Belue had provided, nor did Tapia file a Motion for a Restraining Order following the expiration of the November 20, 2018, 4:30 p.m. deadline set forth in Schulte's email.  Schulte did, however, ask for and receive further guidance and/or clarifications on how Tapia should respond if a VCU student sends him an email or voicemail, which Belue promptly provided.[26]

24.     Over the next several weeks, Schulte called and emailed Belue asking how Tapia should respond to various issues or matters within the context of the administrative leave.  Each time Belue provided the guidance requested, which Schulte accepted without dispute or question.[27]

25.     Tapia filed his Complaint in this action on December 28, 2018, and, in response to the omission from the Complaint of any reference to the verbal and written clarifications made on November 20, 2018, Brixey sent Tapia a letter dated January 3, 2019, reminding Tapia that VCU had clarified the terms of his administrative leave on November 20, 2018 were applicable only to work and work-related contact, explaining the reason Tapia had been placed on administrative leave, and again inviting Tapia to contact him should he have any questions or concerns about the

---

[24] Belue Declaration, paragraph 7.
[25] Belue Declaration, paragraph 8.
[26] Belue Declaration, paragraph 9.
[27] Belue Declaration, paragraph 10.

scope of his administrative leave.[28]

26.     Tapia did not respond to that letter, nor did he otherwise dispute that the terms of his leave had been clarified on November 20, 2018.[29]

27.     On February 15, 2019, Brixey sent Tapia a letter informing him that VCU had completed its review of the issues that triggered the need for the administrative leave and that, effective immediately, VCU was "lifting the administrative leave, including any ancillary restrictions related to your leave." That letter states, among other things, that if Tapia wanted to respond to any point raised in the letter, he had ten days to schedule a meeting, send an email, or send any documentation that he wanted Brixey to consider, and that Brixey would consider any response Tapia provided in determining whether the letter should be revised.[30]

28.     Tapia did not dispute, request a meeting, object to or offer any documentation to rebut any of the issues raised in Brixey's February 15, 2019 letter within the stated ten day period.[31]

29.     At no time since October 25, 2018 has Tapia requested any "name-clearing" hearing, nor has any such hearing been denied to Tapia.[32]

30.     Tapia has not submitted any dispute or claim pursuant to the Faculty Mediation and Grievance Policy, nor has he attempted to seek clarification on or dispute the terms or implementation of the administrative leave, except to the extent described herein, pursuant to VCU's Code of Conduct.[33]

31.     VCU's policies on tenure do not prohibit or require a hearing prior to a tenured

---

[28] Brixey Declaration, at Exhibit B (Letter dated January 3, 2019).
[29] Brixey Declaration, at paragraph 5.
[30] Brixey Declaration, at paragraphs 6-7 and at Exhibit C (Letter dated February 15, 2019).
[31] *Id.* Brixey Declaration, at paragraphs 6-7 and at Exhibit C (Letter dated February 15, 2019).
[32] Brixey Declaration II, paragraph 1.
[33] Brixey Declaration II, paragraph 2; *see* Faculty Mediation and Grievance Policy, attached as Exhibit 4; VCU's Code of Conduct, attached as Exhibit 5.

employee being placed on paid administrative leave.[34]

32.     Brixey played no role in drafting Simblist's email dated October 26, 2018.[35]

II.     <u>ARGUMENT</u>

A.     <u>SUMMARY JUDGMENT STANDARDS</u>

Summary judgment is appropriate where, as here, the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party moving for summary judgment must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

B.     <u>THE OFFICIAL CAPACITY CLAIMS SET FORTH IN COUNTS I, II, AND III ARE BARRED BY THE ELEVENTH AMENDMENT</u>

The official capacity claims Tapia has asserted against Rao, Brixey and Simblist, each of whom are employees of VCU, are fundamentally barred by sovereign immunity under the Eleventh Amendment.  *Armstrong v. James Madison Univ.*, No. 5:16-cv-00053, 2017 U.S. Dist. LEXIS 25014, at *12 (W.D. Va. Feb. 23, 2017).  Under well-settled law, VCU is an agency of the Commonwealth of Virginia, *see* Va. Code § 23.1-100 (identifying VCU as a "public institution of higher education"), and any claim brought against a state agency or state officials acting in their official capacities are considered as claims against the Commonwealth of Virginia itself.  *See Herron v. Va. Commonwealth Univ.*, 366 F. Supp. 2d 355, 364 (E.D. Va. 2004) ("The [Eleventh Amendment] immunity also extends to [a VCU employee] in his official capacity because the claim against him is still considered an action against the state."); *Demuren v. Old Dominion Univ.*, 33 F. Supp. 2d 469, 475 (E.D. Va. 1999) ("[S]tate colleges and universities are agents of the state,

---

[34] Faculty Promotion and Tenure Policies and Procedures, attached as Exhibit 6.
[35] Brixey Declaration, paragraph 4; *see* Tapia Deposition, page 184-85.

and thus immune from suit under the Eleventh Amendment.").  This immunity has neither been abrogated, nor waived, *see Gordon v. James Madison Univ.*, No. 5:12cv00124, 2013 U.S. Dist. LEXIS 73696, at *2 (W.D Va. May 24, 2013), can be raised at any time, *see generally Herron*, 366 F. 2d at 362 (finding that §§ 1981 and 1983 claims against VCU and a VCU employee sued in his official capacity were barred by the Eleventh Amendment, and further acknowledging that "the defense of sovereign immunity can be raised at any time"), and Rao, Brixey and Simblist have each timely raised this defense in the Answer.

In addition to providing immunity against claims for monetary relief, Eleventh Amendment immunity affords full protection to states and state agencies from claims for injunctive and declaratory relief.  *McCray v. Md. Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014) (citing *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 363-64, 121 S. Ct. 955, 148 L. Ed. 2d 866 (2001)); *Armstrong*, 2017 U.S. Dist. LEXIS 25014, at *12.  Officials sued in their official capacities are likewise protected by this immunity, except that a court may issue prospective injunctive relief against officers sued in their official capacity where it is necessary to prevent ongoing violations of federal law.  *Bland v. Roberts*, 730 F.3d 368, 390 (4th Cir. 2013) (quoting *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010)).  This narrow exception to sovereign immunity, known as the *Ex parte Young* exception, is limited to those instances where prospective injunctive relief is necessary to stop an ongoing violation of federal law.  *Debauche v. Trani*, 191 F.3d 499, 505 (4th Cir. 1999) (affirming the denial of declaratory and injunctive relief against state officers sued in their official capacities); *see Green v. Mansour*, 474 U.S. 64, 68 (1985) (observing that "compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment").

As the Fourth Circuit stated in *Debauche v. Trani,* a case (like here) brought against the

president of VCU in his official capacity, "The *Ex parte Young* exception . . . applies only when there is an ongoing violation of federal law that can be cured by prospective relief. It does not apply when the alleged violation of federal law occurred entirely in the past." *DeBauche*, 191 F.3d at 505.  Unsupported claims (or even fears) that a one-time past event might be repeated in the future, such as when the plaintiff in *DeBauche* claimed that she had previously and "will be excluded from future debates" by the president of VCU, do not fall within the *Ex parte Young* exception, because "[m]ere conjecture is insufficient to transform a one-time event into a continuing governmental practice or an ongoing violation."  *DeBauche*, 191 F.3d at 505.  And as the claims asserted against that VCU president in his official capacity in that case did "not fall within the *Ex parte Young* exception," the Fourth Circuit found "no reason not to apply to traditional principles of Eleventh Amendment immunity to dismiss the claims against [the VCU president] in his official capacity."  *Id.*

Here, it is undisputed that the temporary administrative leave issued on the evening of November 19, 2018 was lifted on February 15, 2019.  To be sure, the letter to Tapia dated February 15, 2019 states specifically and unequivocally that, "[W]e are lifting your administrative leave, including any ancillary restrictions related to your leave, such as access to campus resources."[36] Tapia has likewise conceded that the leave was lifted on February 15, 2019 and that he is now in the same position that he was prior to being placed on administrative leave on November 19, 2018. Tapia testified further that he is not aware of any current or ongoing violations of law and does not have any facts or even a belief that there will be any in the future.

As in *DeBauche*, the allegations Tapia makes in the Complaint concern violations of federal law that allegedly occurred in the past and are subject to the immunities and protections of

---

[36] Brixey Declaration, at Exhibit C (Letter of February 15, 2019).

the Eleventh Amendment.  To the extent Tapia asserts that because VCU put Tapia on leave from November 19, 2018 to February 15, 2019 – which apparently is the only time he has been placed on leave during the past thirty years that Tapia has worked for VCU – it might do it again, this would be the exact type of "[m]ere conjecture" that that the Fourth Circuit rejected in *DeBauche.* Indeed, it is less than a "[m]ere conjecture," given that Tapia has testified that he does not have any facts or a belief that there will be a violation of his rights in the future.

Rao, Brixey and Simblist are entitled to the protections of the Eleventh Amendment immunities and the narrow exception established in *Ex parte Young* simply does not apply.  The claims asserted in Counts I, II and III against Rao, Brixey and Simblist in their official capacities are barred by Eleventh Amendment and not subject to the exception of *Ex parte Young.* They should be dismissed.

C.   THE DUE PROCESS CLAIMS ASSERTED IN COUNT III FAIL AS A MATTER OF LAW.

1.   TAPIA CANNOT ESTABLISH THAT HE WAS DEPRIVED OF A PROPERTY INTEREST, AS TAPIA WAS PLACED ON PAID LEAVE, WAS NOT TERMINATED OR DEMOTED, AND HAS BEEN RETURNED TO HIS PRIOR POSITION.

The "first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'"  *American Mfr's Mut'l Ins. Co. v. Sullivan*, 526 U.S. 40, 59, (1999).  Whether a deprivation of constitutional rights has occurred is not dependent upon the subjective feelings or beliefs of a claimant.  Rather, in order to properly maintain a due process claim, a plaintiff must have been, in fact, deprived of a constitutionally protected liberty or property interest. *Tigrett v. Rector & Visitors of the Univ. of Va.*, 290 F.3d 620, 628 (4th Cir. 2002).  Here, Tapia has presented three separate but distinctly different due process claims in Count III – that he was deprived of a property interest without due process, that he was deprived of a liberty interest without due process, and that he was subjected to a "stigma-plus" type

deprivation without due process.

As for the "property" interest based claim, Tapia fails to present facts showing that this deprivation rises to a constitutional level, as a temporary administrative leave (particularly if paid and if the person is returned to their normal position after the leave) does not constitute a constitutional deprivation.  *See Jensen v. W. Carolina Univ.*, Case No. 2:11cv33, 2012 U.S. Dist. LEXIS 182662 (W.D.N.C. 2012) (finding that the plaintiff's paid administrative leave was neither a violation of a constitutional due process right, nor a violation of a "clearly established right"); *Jenkins v. King George Cty. Pub. Schs*, Civil Action No. 3:07CV072-HEH, 2007 U.S. Dist. LEXIS 25856, at *4-5 (E.D. Va. Apr. 6, 2007) (where employee was not discharged, actually or constructively, neither a suspension nor demotion constitutes an actionable deprivation of a liberty interest); *see Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 544-45 (1985) (recognizing that an employer can avoid the requirements imposed by the due process clause by suspending the employee with pay); *see also Bd. Of Regents v. Roth, 408 U.S. 564, 577 (1972)* (Constitutionally protected property interests not created by the Constitution; instead, they are defined by existing rules  that originate in an independent source such as state law); *Carroll v. Town of Univ. Park*, CIVIL NO. Y-96-1626, 1997 U.S. Dist. LEXIS 22791, at *8 (D. Md. Aug. 11, 1997).

A recent case from the Northern District of New York, *Stamboly v. Bd of Educ. of Rome City Sch. Dist.,* Case 6:17-CV-552, 2019 U.S. Dist. LEXIS 80936 (N.D.N.Y May 14, 2019), is directly on point and worthy of review.  In *Stamboly,* the plaintiff, the Athletic Director of the Rome City School District with tenure, sued the District's Superintendent for placing him on administrative leave, with pay, until further notice, instructing him to not enter onto District property "except with [the Superintendent's] expressed [sic] permission . . . [and that his] permission would not be withheld reasonably," on September 16, 2016. *Id.* at * 3.  The Athletic

Director asserted that the Superintendent then filed criminal charges against him, resulting in his arrest for felony-level trespass. Those charges were eventually dismissed and the Athletic Director was reinstated to his position on February 14, 2017. Upon his return, the Athletic Director defamed him and vilified him through numerous public statements and newspaper articles, causing him extreme emotional distress and requiring treatment for Post-Traumatic Stress Disorder. The Athletic Direct filed suit against the Superintend under § 1983 claiming that he suffered a deprivation of his "property" interest without due process and a "stigma-plus" claim. The *Stamboly* court granted summary judgment on both of those claims, finding that being placed on this type of administrative leave does not, as a matter of law, support a deprivation of a property interest. *Id.* at *7-8 (citing *O'Connor v. Pierson*, 426 F.3d 187, 199 (2d Cir. 2005) (noting that "no court has held that an employee on fully paid leave has been deprived of a property right merely by virtue of being relieved of his job duties"); *Vosburgh v. Burnt Hills - Balston Lake Cent. Sch. Dist.*, No. 1:18-CV-1003 (MAD/CFH), 2019 U.S. Dist. LEXIS 11656, 2019 WL 315054, *7 (N.D.N.Y. Jan. 24, 2019) (noting that "[c]ourts in this Circuit have universally held that the suspension of an employee with pay does not deprive that employee of a legal right" "because employees do not have a property right in doing their job" (citations omitted)). The court also granted summary judgment on the "stigma-plus" claim, holding that as the Athletic Director had been neither terminated nor suspended and he failed to establish the "plus" element necessary to sustain the "stigma-plus" claim. *Id.* at *9-10.

It is undisputed that Tapia was paid while on leave and has since been returned to his full duties. Further, while Tapia is a tenured associate professor, tenure does not shield or entitle a faculty member to be free from discipline or being placed on administrative leave with pay, with or without notice. Finally, and despite the dramatic imagery woven into the Complaint, the letter

dated November 19, 2018 does not state that Tapia was not allowed to be on VCU property; it states only that Tapia was to get prior permission before doing so, a reasonable request in light of the protests and disruptions that centered on Tapia at this time.

      2.    WHETHER OR NOT TAPIA SUFFERED A DEPRIVATION OF A "PROPERTY" INTEREST, HE WAS OTHERWISE PROVIDED DUE PROCESS, BEFORE, DURING AND AFTER THE TERM OF THE ADMINISTRATIVE LEAVE.

Even if Tapia was able to establish the deprivation of a property interest, he was provided all the process that the law requires. For example, despite claims that the administrative leave came suddenly and without explanation, the undisputed facts are that Tapia was well-aware of the disruption that was surrounding his presence at the PAPR immediately prior to November 19, 2018, which included but was not limited to both of his TA's refusing to participate in his classes, students boycotting his class, engaging in protests and sit-ins over his continued presence, among other disruptions. Tapia was provided written notice that the EAS was recommending that further review be undertaken of his actions, and moreover, once Tapia was placed on administrative leave, Belue provided an exhaustive and detailed explanation of the basis and need to place Tapia on a temporary, paid administrative leave. The November 19, 2018 letter, Belue's email to Schulte, and the January 3, 2019 letter all invite Tapia (or his attorney) to contact Brixey or VCU University counsel should Tapia have any questions or concerns about the status of the administrative leave or any employment-related matter. It is undisputed that between November 19, 2018 and December 28, 2018, Tapia (through counsel) repeatedly sought out and received clarifying information about such matters, which it is undisputed were on each occasion accepted by Tapia and/or his counsel.

In addition, according to VCU policy, if Tapia had any question or dispute about any employee-related concern, he was invited to engage in the Dispute Resolution Procedure, which

includes both an informal and formal process. If he was concerned that the administrative leave was overbroad, pursuant to VCU's Code of Conduct, Tapia also had multiple avenues for relief, including contacting the Integrity and Compliance Office, the VCU Helpline, University Counsel, the VCU Ombudsperson, or his supervisor or department manager.[37]  Further, it is without dispute that at the conclusion of the administrative leave, Brixey recounted not just the need and basis for the leave, but the conclusions VCU had reached while Tapia was on this leave.

Further, Brixey also informed Tapia that should he wish to dispute the basis for the leave or any of the other issues addressed in the February 15, 2018 letter, all he need do was make an appointment to meet with Brixey, send Brixey any relevant documentation, or otherwise contact Brixey within ten business days. However, Tapia chose to waive his right to dispute, question or even discuss the issue.  Finally, Tapia had – and at all times knew he had – the protections of tenure and that if he were demoted or terminated, he would be entitled to further process, which is set forth in detail in the attached polices.  That did not happen. Therefore, at the very most, all Tapia was entitled to was minimal process, such as a notice that he was being placed on paid administrative, the opportunity to learn why, and the ability to call and ask for guidance or clarification if there was any question or dispute about the terms of the administrative leave.  *See Pavel v. Univ. of Or.*, No. 18-35287, 2019 U.S. App. LEXIS 15920, at *1-4 (9th Cir. May 29, 2019).

As Judge Haynsworth explained in *Thomas v. Ward*, 529 F.2d 916 at 919 (4th Cir. 1975), "due process is a flexible concept, the very nature of which negates any concept of inflexible procedures universally applicable to every imaginable situation." Always the question is, as stated

---

[37] See Working at VCU Great Place HR Polices, Employee Relations (Including Dispute Resolution, Employee Conduct, Disciplinary Procedures and Workforce Reduction) for University and Academic Professionals; *see also* VCU's Code of Conduct, page 5.

in *Morrissey v. Brewer,* 408 U.S. 471, at 481 (1972), that "once it is determined that due process applies, the question remains what process is due."  This is so because, as the court adds, "not all situations calling for procedural safeguards call for the same kind of procedure."  There are many situations where but minimal due process rights, limited at most to notice and right to be heard, are required.  *Clark v. Whiting*, 607 F.2d 634, 643 (4th Cir. 1979).  And while a "tenured public employee" facing an adverse action like termination or demotion is entitled to minimum due process, such as "oral or written notice of the charges against him, an explanation of the employer's evidence, and opportunity to present his side of the story" either before or after the deprivation, see *Cleveland*, 470 U.S. at 546, where, as here, the alleged deprivation was far less and only temporary, there can be no dispute that the process that was afforded was appropriate and met the minimum requirements required by law.

For all of these reasons, to the extent the due process claim set forth under Count III is based on the theory that Tapia was deprived of a property interest, that claim is without merit and should dismissed.

3.   TAPIA CANNOT ESTABLISH THAT HE WAS DEPRIVED OF A SEPARATE "LIBERTY" INTEREST AND WAS OTHERWISE PROVIDED ALL DUE PROCESS WITH REGARD TO THIS ALLEGED DEPRIVATION.

Nor can Tapia establish that he was deprived of a "liberty" interest in support of his due process claim. Notably, Tapia does not set forth or explain exactly what "liberty" interest he is asserting the deprivation of in Count III – this claim is only mentioned in three paragraphs in the Complaint, paragraphs 65, 66 and 67.  Even then, Tapia only states is that "because the ban on Tapia manifestly implicates rights he possesses under the First Amendment, it was incumbent on VCU not to undertake any action encroaching on those rights without first according Tapia due process of law."  As Tapia fails to adequately plead or explain how he was deprived of a "liberty"

interest with regard to his due process claim, for this reason alone this part of the due process claim should be dismissed.

Alternatively, and to the extent this "liberty" interest is not simply repetitive of the "property" interest or "stigma-plus" claim, the restrictions that were allegedly placed on Tapia were reasonable and do not rise to the level of a constitutional deprivation.

Even if Tapia were able to establish an independent "liberty" interest deprivation, as discussed in Section C.2 above, Tapia received due process with regard to this alleged deprivation. Having failed to either set forth the basis for this claim or establish that he suffered the deprivation of a separate "liberty" interest, and as Tapia received sufficient due process with regard to this alleged deprivation, to the extent Tapia's due process claim rests on the allegation that he was deprived of a "liberty" interest that claim is without merit and should be dismissed.

4.  A "NAME-CLEARING" HEARING IS THE ONLY REMEDY FOR A "STIGMA-PLUS" CLAIM, AND WHERE NO "NAME-CLEARING" HEARING HAS BEEN REQUESTED, THAT CLAIM MUST BE DISMISSED.

As an initial matter, a plaintiff cannot prosecute a "stigma-plus" claim if he does not first request a "name-clearing" hearing and then be denied that request.  The request for a "name-clearing" hearing must be clear and sufficient, such that it sufficiently appraises the defendant of a desire for such a hearing.  Where no such request is made, the due process claim is subject to summary judgment. *Moore v. City of Cleveland*, No. 1:18-CV-1849, 2019 U.S. Dist. LEXIS 85401, at *9 (N.D. Ohio May 21, 2019); *see Rosenstein v. City of Dallas*, 876 F.2d 392, 395 (5th Cir. 1988) (stating that "the process due . . . an individual [whose reputation has been damaged] is merely a hearing providing a public forum or opportunity to clear one's name, not actual review of the decision to discharge the employee") (citing *Roth*, 408 U.S. at 573 n.12).

It is undisputed that Tapia did not request a "name-clearing" hearing prior to filing suit.

It is also undisputed that he did not request such a hearing after filing suit, nor does the Complaint claim that a "name-clearing" hearing was requested or even that one be provided as a form of relief. As a "name-clearing" hearing is the only relief available. *Torrey v. New Jersey*, Civil Action No. 13-1192, 2014 U.S. Dist. LEXIS 31146, at *33-34 (D.N.J. Mar. 11, 2014).  As Tapia did not seek a "name-clearing" hearing, any due process claim that is based on a "stigma-plus" claim, is subject to a summary dismissal.

5.    EVEN IF HE HAD REQUESTED A "NAME-CLEARING" HEARING, TAPIA CANNOT ESTABLISH A "STIGMA-PLUS" CLAIM

Even if Tapia had requested and was denied a "name-clearing" hearing, this claim otherwise fails as a matter of law.  To establish a "stigma-plus" claim, a plaintiff asserting a reputational "liberty" interest protected by the Fourteenth Amendment must show both (i) the infliction by a state official of a "stigma" to plaintiff's reputation and (ii) the deprivation of a legal right or status.  *See Paul v. Davis*, 424 U.S. 693, 710-11 (1976); *see also Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 315 (4th Cir. 2012) (noting that the "stigma-plus" test is met if the plaintiff's "reputational injury was accompanied by a state action that 'distinctly altered or extinguished' his legal status").  In addition, the plaintiff must allege: "(i) a stigmatizing statement (ii) made public by the public university, (iii) in conjunction with his expulsion from the university, and (iv) that the charge was false." *Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 723 (E.D. Va. 2015) (citation omitted); *see Sciolino v. City of Newport News*, 480 F.3d 642, 646 (4th Cir. 2007).  Finally, a "stigma-plus" claim requires that the same government official be responsible for both the action depriving the plaintiff of a liberty interest (the plus), as well as the statement harming the plaintiff's reputation (the stigma).  *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 10 (1st Cir. 2011) ("Where the stigma and the incremental harm — the "plus" factor — derive from distinct sources, a party cannot make out a viable procedural due process claim");

*Eberhard v. Cal. Highway Patrol*, 73 F. Supp. 3d 1122, 1131 (N.D. Ca. 2014) (same); *see also Matsey v. Westmoreland Cty.*, 185 F. App'x 126, 133 (3d Cir. 2006) ("Matsey is not entitled to a "name-clearing" hearing to correct false and stigmatizing information that was published or disseminated by someone other than Appellees, such as through independent media investigation or speculation, or because his attorney chose to speak with a reporter. *Roth* does not impose an obligation on government employers to correct false information published or disseminated by others."); *Deluca v. City of Hazleton*, No. 3:15-CV-02475, 2019 U.S. Dist. LEXIS 93006, at *27 (M.D. Pa. June 4, 2019).

While Tapia attempts to establish this claim by citing to Simblist's email of October 26, 2018, this email was only sent to five VCU administrators and never viewed by the public.  *See, e.g.*, *Judge v. Shikellamy Sch. Dist.*, 135 F. Supp. 2d 284, 295 (M.D. Pa. 2015) (statements made in a private letter were not alleged to be "made public as required to state a deprivation of a liberty interest."); *see also Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005) (""The defamatory statement must be sufficiently public to create or threaten a stigma; hence, a statement made only to the plaintiff, and only in private, ordinarily does not implicate a liberty interest.").  Further, this statement is by its own terms opinion and not capable of being proven false.  *See Hopkins v. Lapchick*, No. 97-1379, 1997 U.S. App. LEXIS 30507, at *4 (4th Cir. Nov. 7, 1997) (calling someone a "racist" is not capable of a defamatory meaning because the phrase was simply an expression of the author's non-actionable opinion). Nor can Tapia establish a "stigma-plus" claim on the open letter that Simblist sent on October 28, 2018, as that email, which did not refer to Tapia or Cherry by name, merely stated that a complaint had been made by another teacher, that the matter was being investigated, and that VCU was taking the matter seriously.  This email cannot establish the basis for a "stigma-plus" claim, as "[c]ourts have consistently held that statements announcing personnel

decisions, even when leaked to the press, and even when a reader might infer something unfavorable about the employee, are not actionable." *Wiese v. Kelley*, Case No. 08-cv-6348, 2009 U.S. Dist. LEXIS 82307,  at *4 (S.D.N.Y. Sept. 10, 2009) (collecting authority).  In addition, "true public statements that a party is under investigation" are not stigmatizing and cannot support a "stigma-plus" claim.  *Id.*, 2009 U.S. Dist. LEXIS 82307, at *5 (collecting authority).

Finally, Tapia cannot point to any fact to show that he was terminated or that he was put on unpaid disciplinary leave to investigate the claim of discrimination asserted by Cherry, which is fatal to his "stigma-plus" claim.  *Vosburgh*, 2019 U.S. Dist. LEXIS 11656, at *22-23 (paid administrative leave is not a termination for purposes of a "stigma-plus" claim); *Neu v. Corcoran*, 869 F.2d 662, 666-67 (2d Cir. 1989) ("The Supreme Court has "strongly suggest[ed] that defamation, even if it leads to a significant loss of employment opportunities, is not a deprivation of a liberty interest unless it occurs in the course of dismissal or refusal to rehire the individual as a government employee or during termination or alteration of some other legal right or status.") (discussing *Paul*, 424 U.S. 693); *see also Shirvinski*, 673 F.3d at 316 (noting that the plaintiff's "procedural due process claim is nothing more than an ordinary defamation action dressed in constitutional garb").

For all of these reasons, the "stigma-plus" claim fails as a matter of law and should be summarily dismissed.

D.     BRIXEY AND SIMBLIST ARE ENTITLED TO QUALIFIED IMMUNITY

As recognized by Judge Hudson as recently as three months ago when he dismissed similar due process claims made against Virginia State University administrators, "government officials sued in their personal capacities for violations of federal rights are entitled to qualified immunity if the right asserted was not clearly established at the time of the violation."  *Sheppard v. Visitors*

*of Va. State Univ.*, Civil Action No. 3:18-CV-723-HEH, 2019 U.S. Dist. LEXIS 70661, at \*16-17 (E.D. Va. Apr. 25, 2019).  In resolving claims of qualified immunity, a court must determine (1) whether the facts, as alleged by the plaintiff, make out a violation of a constitutional right and (2) whether that right was "clearly established" at the time of the administrators' alleged misconduct.  *Id.*  Further, a plaintiff must show that the official charged "acted personally in the deprivation of the plaintiff's rights . . . the application of respondeat superior has no application under [§ 1983]."  *Id.* at 16 (quoting *Wright v. Collins*, 776 F.2d 841, 850 (4th Cir. 1985)).  "[I]n order for an individual to be liable under Section 1983, it must be affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights."  *Garraghty v. Va. Dep't of Corrections*, 52 F.3d 1274, 1280 (4th Cir. 1995); *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977).  Liability cannot attach if a defendant merely fails to act to prevent a constitutional deprivation; an active role is essential.  *Rizzo v. Goode*, 423 U.S. 362, 377 (1976).

For the reasons set forth in the above sections, Brixey and Simblist contend that Tapia has not and cannot establish that his constitutional rights have been violated.  To the extent that any of Tapia's claims constitute a close call or that there is no similar prior case to guide their actions, Tapia cannot establish that Simblist or Brixey knew that it was "beyond debate" that their actions constituted a violation of Tapia's constitutional rights.  *See Doe*, 132 F. Supp. 3d at 725 (qualified immunity applies unless "at the time of the challenged conduct, the contours of the right are sufficiently clear such that every reasonable official would understand that what he is doing violates that right – in other words, the legal question must be 'beyond debate.'"); *see also DeBauche*, 191 F.3d at 505 (finding that the VCU president was entitled to qualified immunity in his individual capacity because "he could not have known at the time that [his alleged] conduct was constitutionally prohibited.").

23

While it is clear that both Brixey and Simblist are entitled to qualified immunity, it is helpful to review Tapia's claims as they relate to each defendant.  For example, for liability to attach to Simblist in his individual capacity, Tapia must demonstrate that Simblist personally deprived Tapia of an established constitutional right.  There is no evidence, however, that Simblist played any role in the decision to place Tapia on administrative leave.  Nor is there any evidence that Simblist was involved in establishing the terms of Tapia's administrative leave.  Finally, as it has not been established that liability can attach to one state actor where he only participates in some of the underlying facts that make up the constitutional claim, including but not limited to the issue of whether the same state actor must be responsible for both the "stigma" and the "plus," there can be no clearly established violation and qualified immunity therefore applies.  *See Pavel v. Univ. of Or.*, No. 18-35287, 2019 U.S. App. LEXIS 15920, at *1-4 (9th Cir. May 29, 2019) (Whether the same actor must publicize the stigmatizing information and deprive the plaintiff of his protected property interest has not been clearly established in the law, and as no clearly established law was violated here, qualified immunity applies).  Counts I, II and III all rest in some way on the issuance of the administrative leave, but as there is no evidence that Simblist was involved in that decision, Tapia cannot establish that Simblist violated Tapia clearly established rights.  Simblist is according entitled to qualified immunity with respect to the claims in Counts I, II, and III that have been asserted against him in his individual capacity.

As for Brixey, there are no facts that demonstrate he played any role or took any action that placed a "stigma" on Tapia.  The most that Tapia can claim is that Brixey received a copy of the email that Simblist sent on October 26, 2018.  It cannot be said that Brixey violated any clearly established right by receiving an email and as he is therefore entitled to qualified immunity on the "stigma-plus" claim asserted in Count III.

Likewise, Brixey is entitled to qualified immunity on any remaining parts of Count III, as Tapia has not and cannot establish that Brixey knew that he was violating Tapia's clearly established rights either by placing him on a temporary, paid administrative leave.  Further, even if this Court were to find that Tapia was deprived of a property or liberty interest and did not receive the minimum amount of due process, it cannot be said Brixey knew at the time that he was violating Tapia's clearly established rights.  There being no established case law in this Circuit that would have placed the issue of what legal rights Tapia was due in this instance, Brixey did not violate any clearly established rights and he is therefore entitled to qualified immunity on Count III.

As for Counts I and II, whether or not one agrees with Tapia's overly expansive reading of the administrative leave described in Brixey's November 19, 2018 letter, there is no dispute that Brixey included in that letter an invitation to call him and discuss the terms or need for that administrative leave.  Furthermore, Brixey was aware that before the ink was dry on that letter, Tapia, through his counsel, requested and received clarification as to the scope of the administrative leave.  Brixey was also aware that Tapia demanded written confirmation of this clarification and issued the ultimatum that if this clarification were not provided, Tapia would file a Motion for a Temporary Restraining Order.  Brixey was aware that this written confirmation was then provided and that no such motion was filed after that deadline expired.  Under such facts, it is clear that when Brixey placed Tapia on paid administrative leave, requiring only that Tapia refrain from work-related conduct, whether that meant refraining from coming on campus without permission or engaging in discussions with VCU faculty, staff or student about work-related issues, Brixey was not violating Tapia's clearly established rights.

Throughout these proceedings, from the Complaint to the Motion for Preliminary Injunction, Tapia has characterized his paid administrative leave as a "gag order" and a "ban" and cited to inapplicable authority addressing challenges imposed by statutes.  It is helpful to review this in context.  At issue is not a challenge to a statute prohibiting, for example, commercial free speech, but rather the legitimate and necessary placement of an employee on a non-disciplinary leave, with full pay, so that it could address issues critical to the mission of the University, issues that were not resolved but raised the completion of the EAS Inquiry.  To conduct this investigation and in an effort to calm to an escalating situation that threated the core mission of the University – education – Brixey directed that the employee temporarily refrain from work-related activity.  It is temporary and paid administrative leave – which has been lifted – about which Tapia complains.

As the Supreme Court noted in *Connick v. Myers*, 461 U.S. 138 (1983), "We hold [] that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."  461 U.S. at 147, cited in *Boring v. Buncombe County Bd. of Education*, 136 F.3d 364, 368 (4th Cir. 1998). "A government employer, no less than  a private employer, is entitled to insist upon the legitimate, day-to-day decisions of the office without fear of reprisals in the form of lawsuits from disgruntled subordinates who believe that they know better than their superiors how to manage office affairs." *DiMeglio v. Haines*, 45 F.3d 790, 806 (4th Cir. 1995).

Professor Smolla, when writing as an academic and not as an advocate, addressed the issue of free speech rights in the university context.  Citing the Supreme Court decision in *Pickering v. Board of Education*, 391 U.S. 563 (1968), he wrote:

26

The State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with the regulation of speech of the citizenry in general." The task is to calibrate the right accommodation between those competing interests, and thereby "arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

The *Connick/Pickering* standard has evolved into a two-step inquiry. When a public employee complains that he or she has been discharged in retaliation for the exercise of free speech rights, a court first must ask whether the employee was speaking "as a citizen" on "a matter of public concern." If the answer is no, the employee loses the case. If the answer is yes, the court proceeds to part 2 of the test, in which it weighs the rights of the employee against the government's justification for limiting the speech. The focus of this part tends to be on whether the particular government agency is able to demonstrate that the speech at issue in some palpable sense disrupts or interferes with the agency's function.

The Supreme Court in *Garcetti v. Ceballos* [547 U.S. 410] (2006) curtailed the free speech rights of government employees by narrowing the scope of part 1 of the *Connick/Pickering* test. …The Court in *Garcetti* held that in determining whether the speech at issue is speech "as a citizen on matters of public concern," the critical inquiry is whether the speech of a government employee is speech required by the employee's job—speech that falls within the official duties of the employee as part of the job description for the position the employee occupies. If the speech is required as part of the job description, the Court held, the employee will be deemed to be speaking "as an employee" and not "as a citizen" … [and] will be deemed subject to the rules and restrictions established by the government in its capacity as an employer, which means an employee can be disciplined or even fired for violating the rules established by the employer's governmental supervisors."

Smolla, *The Constitution Goes to College* (2011), 129-30.

The chapter on Free Speech Rights of Faculty continues, with this quotation from the trial court ruling granting summary judgment in *Cohen v. San Bernadino Valley College*, 883 F.Supp. 1407, 1420 (D.D. Cal. 1995):

The Supreme Court has clearly stated that the public employer must be able to achieve its mission and avoid disruption of the workplace. Within the educational context, the university's mission is to effectively educate students, keeping in mind students' varying backgrounds and sensitivities. Furthermore, the university has the right to preclude disruption of this educational mission through the creation of a hostile learning environment.

*Id.* at 134.

Professor Smolla noted that the 9th Circuit reversed the trial court, but observed, "If today's Supreme Court were to review the decision, there is a strong chance that, given its ruling in *Garcetti v. Ceballos*, it would reverse [the Ninth Circuit] and instead adopt the view of [the trial court]."

*Id.* at 135.

Professor Smolla addressed the concept of "public forum law" in his article, *Academic Freedom, Hate Speech, and the Idea of a University,* 53 Law and Contemporary Problems, 195, 218 (Summer 1990):

> [T]he nonpublic forum consists of publicly owned facilities that have … never been designated for indiscriminate expressive activity by the general public. [T]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government.  The content-based regulation of speech in a nonpublic forum is not governed by the strict scrutiny test, but by a "reasonable nexus" standard.  The government "may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation of speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's views.  Entire classes of speech may thus be excluded from a nonpublic forum.  Those classes may be identified by content, as long as the exclusion is reasonable in light of the purpose of the forum … Control over access to a nonpublic forum can be based on subject matter and speaker identify so long as the distinctions drawn are reasonable in light of the purpose served by the forum."

Ironically, it is Professor Smolla's analysis – and not Advocate Smolla's colorful arguments  – that is helpful to illustrate the importance of placing the challenged action in the correct context.  Constitutional rules are and must be nuanced, and evaluated with recognition of the particular circumstances, programs, spaces, and places in which they are being applied.  Here, the challenged action is a dean's direction that a tenured professor refrain from work-related activity, while remaining on full pay, without threat of discharge or demotion, and while the University continues to evaluate issues raised and confront a social media storm that results in

protests and disruption of the academic environment.  This is precisely the type of  situation that requires the application of the reasonable nexus standard, which recognizes the university's primary objective – the education of students.  It does not rise to the level of a constitutional violation.

Nor is this is an instance where VCU told Tapia that it would only enforce the prohibitions of the administrative leave if Tapia engaged in egregious misconduct.  *United States v. Stevens*, 559 U.S. 460 (2010) and *Legend Night Club v. Miller,* 637 F.3d 291 (4th Cir. 2010), which concern either a governmental promise to not unreasonably enforce an arguably overbroad statute, or a claim that a history of limited enforcement is the same as a formal amendment of the statute by the legislature, are inapplicable.  Brixey alone imposed the restrictions of the administrative leave, and as such had the authority to modify, or lift them (as indeed he did on February 15, 2019), so there can be no parallel drawn with efforts by prosecutors to provide assurances that laws will not be enforced in accordance with their terms.  Of course, the administrative leave that Brixey implemented is not a state statute or even a school policy, but rather a non-disciplinary personnel action directed by a senior administrator to one individual employee.[38]

Finally, it is undisputed that Schulte, on behalf of Tapia, requested and was provided the very clarification that was desired – that the administrative leave only related to work and work-related conduct and did not prohibit casual, non-business-related contact.  Tapia cannot effectively deny the impact of that clarification, nor can he credibly assert the terms of the temporary, non-punitive administrative leave, as clarified, constituted even a temporary violation of his First

---

[38] Furthermore, Tapia requested in his Complaint that the Court instruct Brixey to "immediately lift" the restrictions included in the administrative leave.  Having conceded that Brixey was the very individual who had the authority to clarify or lift the restrictions which accompanied the administrative leave, Tapia cannot now contend that Brixey was offering a non-binding "limiting construction."

Amendment rights, much less that Brixey violated Tapia's clearly established rights in putting Tapia on leave under these circumstances.

While it is not surprising that a civil rights attorney or First Amendment advocate might find a way to twist the intentions of Brixey's letter into a "gotcha" type violation, for purposes of qualified immunity, the standard is far different.  And because there is no similar case that would make it beyond doubt that the administrative leave described herein violated Tapia's clearly established rights, Brixey is entitled to qualified immunity on Counts I and II.

<u>CONCLUSION</u>

Rao, Brixey and Simblist are entitled to Eleventh Amendment immunity on the claims asserted against them in their official capacities, Brixey and Simblist are entitled to qualified immunity on the claims asserted against them in their individual capacities, and for the reasons asserted herein, Counts I, II and III are otherwise without merit and should be dismissed.  Further, as Rao, Brixey and Simblist are asserting claims of immunity and qualified immunity, it is hereby requested that until these issues be resolved this matter and all pending deadlines be stayed.

Defendants respectfully request that this Court grant its Motion for Summary Judgment and dismiss the Complaint with prejudice pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56, stay these proceedings until a ruling can be made on these issues, and award any other relief the Court deems appropriate as a matter of law.

Dated:  June 21, 2019               Respectfully submitted,

MICHAEL RAO, NOAH SIMBLIST
and SHAWN BRIXEY

_____/s/_____
Kevin D. Holden (VSB No. 30840)
Lindsey A. Strachan (VSB No. 84506)
David E. Nagle (VSB No. 20571)
Jackson Lewis P.C.
701 E. Byrd St., Richmond, VA 23219
P.O. Box 85068, Richmond, VA 23285
Tel: (804) 649-0404
Fax: (804) 649-0403
kevin.holden@jacksonlewis.com
lindsey.strachan@jacksonlewis.com
david.nagle@jacksonlewis.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2019, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system which will then send a notification of such filing (NEF) to the following:

Blackwell N. Shelley, Jr. (VSB# 28142)          Timothy E. Cupp (VSB No. 23017)
Tim Schulte (VSB #41881)                        Shelley Cupp Schulte, P.C.
Shelley Cupp Schulte, P.C.                      1951 Evelyn Byrd Avenue, Suite D
2020 Monument Avenue, 1st Flr.                  P.O. Box 589
Richmond, VA 23220                              Harrisonburg, VA 22803
Tel: (804) 644-9700                             Tel: (540) 432-9988
Fax: (804) 278-9634                             Fax: (804) 278-9634
shelley@scs-work.com                            cupp@scs-work.com
schulte@scs-work.com

Rodney A. Smolla (VSB# 32768)
4601 Concord Pike
Wilmington, Delaware 19803
(864) 373-3882
(804) 278-9634
rodsmolla@gmail.com

                                        _____/s/_____
                                        Kevin D. Holden (VSB No. 30840)
                                        Lindsey A. Strachan (VSB No. 84506)
                                        David E. Nagle (VSB No. 20571)
                                        Jackson Lewis P.C.
                                        701 E. Byrd St., Richmond, VA 23219
                                        P.O. Box 85068, Richmond, VA 23285
                                        Tel: (804) 649-0404
                                        Fax: (804) 649-0403
                                        kevin.holden@jacksonlewis.com
                                        lindsey.strachan@jacksonlewis.com
                                        david.nagle@jacksonlewis.com

                                        *Counsel for Defendants*