**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| JAVIER TAPIA | ) | |
| | ) | |
|     **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 3:18-cv-899** |
| | ) | |
| | ) | |
| **MICHAEL RAO, et al.** | ) | |
| | ) | |
|     **Defendants.** | ) | |

**PLAINTIFF JAVIER TAPIA'S MEMORANDUM**
**IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**PRELIMINARY STATEMENT**

The Defendants, in their Motion for Summary Judgment, portray themselves as innocent administrators who played no role in the destruction of Javier Tapia's reputation and their depiction of him as a racist allegedly guilty of harassing an African American adjunct professor, Caitlin Cherry. The facts, however, belie Defendants' version of events.

> Q    In your conversations with the Dean, did you raise the concern that Mr. Tapia's reputation appeared to be damaged by what was going on on the Internet?
>     MR. HOLDEN: Objection to form.
> THE WITNESS: No.

Exhibit 1 (Simblist Dep.) at 28:13-18.

While the VCU Defendants may initially have felt traces of empathy for Tapia, *id.* at 29:8-10 ("I do remember that there was an acknowledgement that this must be difficult for Mr. Tapia…"), they abandoned those concerns and instead focused on "building a communications strategy." *Id.* at 26:25-27:3. The foundation of this strategy was the VCU Defendants' condemnation of Tapia as an "unconsciously" biased racist. When Tapia declined to be the sacrificial lamb, Exhibit 2 ("Character assassination on social media is a very serious matter with

professional, ethical, and legal ramifications."), the VCU Defendants were incensed. Directly after the EAS investigators concluded that there was *no* evidence that race had been a factor in the October 25 incident, the Defendant Shawn Brixey issued his gag order, prohibiting Tapia from defending himself. Exhibit 3 (the "November 19 letter").

In the beginning of this conflict, after he had engaged in two five-to-ten-minute conversations with Cherry and Tapia, Exhibit 1 (Simblist Dep.) at 19:21-25, the Defendant Noah Simblist sent two emails about the October 25, 2018 encounter between Tapia and Cherry. The first email went to five VCU administrators and various employees in VCU's Equity and Access Department, stating, "Caitlin Cherry, an African American woman who is an adjunct teaching MFA students for PAPR was (in my opinion) racially profiled and inappropriately criminalized yesterday by Javier Tapia…"  Exhibit 4. In the second email Simblist referred to the "incident in which a senior faculty member encountered an adjunct visiting professor in room 313." Simblist stated, "they did not talk to the adjunct but contacted FAB Security." Simblist continued that the senior faculty member "confirmed the basic facts of the situation." These statements were false and misleading. Exhibit 5 (Tapia's Interrogatory Answers at p. 10). Simblist, the department chair, presented these conclusions with great conviction, but Simblist had no prior experience in conducting an investigation. Exhibit 1 at 13:3-6. ("Q: Do you have any background as an investigator, police work, FBI, anything like that? A: No.").

Simblist's emails, and his false and misleading conclusions, reached over 150 students and faculty of the PAPR department. Exhibit 1 (Simblist Dep.) at 31:21-22. In response to Simblist's email, Professors Inman and Benedetto, and five other professors, signed a faculty letter of protest on November 6, 2018 ("the faculty letter"):

> Q   Okay. About the October 10/25 incident -- the October 25, 2018 incident, between October 25 and November 6, what exactly did you hear or review --
>        MR. HOLDEN: Objection to the form.

   Q   -- that mentioned the incident?
   A   The two e-mails I received, one was from Noah, the chair of the department, and the other one was from the dean's office. And that was all the information that was shared with me.

Exhibit 6 (Inman Dep.) at 37:25-38:8.

     The faculty letter was widely published. It implored Defendant Shawn Brixey, the Dean of the School of Arts, and Director of Diversity and Inclusion Holly Alford "to fully dismantle the structural racism of our department," listing the October 25 incident as "both a fresh trauma for members of our community and a re-stimulation of past trauma for many alumni, faculty, and staff." Exhibit 7 (November 6 letter) at 1. The undersigned faculty mentioned "Javier Tapia" by name and accused him of "an act of racial bias" and "implicit prejudice." *Id.* The letter further urged Brixey, et al., "to name and address white privilege in our department…," *id.* at 2, complained about the department's "toxic culture," *id.*, and lamented "[l]ast week's racially biased incident," *id.* at 3, and "the primary message of racism: You don't belong." *Id.*

     The Defendants also failed to curb online publications of this false and misleading message, even though doing so was within their control. Within an hour and a half after Caitlin Cherry had her encounter with Tia Harris, the unarmed African American security guard, Cherry created a Facebook post that mimicked a "marked safe" Facebook message.[1] Exhibit 8 (Cherry Dep. ) at 53:5-14. Cherry used a so-called "meme generator," an online graphic design application,

---

[1] The Facebook social media platform offers a feature called Safety Check. When an incident such as an earthquake, hurricane, mass shooting or building collapse occurs where people might be in danger, a global crisis reporting agency alerts Facebook. Facebook activates Safety Check if a significant number of its users in the affected area are posting about the incident, If Facebook activates Safety Check, users in the area may receive a notification from Facebook to mark themselves safe. Users who click the Safety Check notification will also be able to see if any of their friends are in the affected area or have marked themselves safe. (Source https://www.facebook.com/help/1761941604022087, last visited June 27, 2019.) The "marked safe" meme used by Cherry spoofs a Facebook Safety Check message. Exhibit 29 (Tapia Decl.) at ¶ 5.

to put together a message that featured a picture of Tapia and the text, "Caitlin Cherry marked himself safe during Old White Male Associate Professor that called Security on Young Black Female Adjunct for Sitting in her Own Classroom Incident." *Id.*; Exhibit 8 a. Cherry intended this post to be ironic. *Id.* 118:18-23.

The post appeared, among other places, in a Facebook closed group[2] named "VCUarts Painting and Printmaking" that had been created by Brennen Perry, an alumnus of the VCU School of the Arts. Exhibit 9 (Brennen Perry Dep) at ____. Perry is a volunteer "admin" of the "VCUarts Painting and Printmaking" closed group, as is Simblist, and other faculty members such as Brooke Inman. Exhibit 9 (Brennen Perry Dep.) at ___. In addition, the VCU Painting and Printmaking Department lists itself as a group "admin" and the closed group is linked to the department's Facebook page,[3] "VCUarts Painting + Printmaking." Exhibit 9 (Brennen Perry Dep. ) at ____. A Facebook group's "admin" has the power to, among other things, approve or deny posts in the group and remove posts and comments on posts.[4] *Id.* (Brennen Perry Dep. ) at ____; Exhibit 29 (Tapia Decl.) at ¶ 8. Any "admin" of the "VCUarts Painting and Printmaking" closed group could have removed Cherry's post or moderated the comments that came in response.

Simblist, in an email to other faculty on October 26, 2018, stated that he was aware "from a confidential source" that Cherry was posting statements "about this incident on closed groups on

---

[2]   A Facebook group is a webpage hosted by Facebook on which Facebook users may communicate about shared interests. (https://www.facebook.com/help/337881706729661, last visited June 27, 2019). Facebook groups offer three levels of privacy: Public (the least private), Closed, and Secret (the most private). (https://www.facebook.com/help/220336891328465, last visited June 27, 2019). Exhibit 29 (Tapia Decl.) at ¶ 6.

[3] A Facebook "page" differs from a Facebook "group" in its use: a "group" is intended to provide communication among group members while a "page" is intended to "enable public figures, businesses, organizations and other entities to create an authentic and public presence on Facebook." (https://www.facebook.com/notes/facebook/facebook-tips-whats-the-difference-between-a-facebook-page-and-group/324706977130/, last visited June 27, 2019). Exhibit 29 (Tapia Decl.) at ¶ 7.

[4] https://www.facebook.com/help/901690736606156, last visited June 27, 2019.

social media." Exhibit 4; see also Exhibit 1, Simblist Dep. Tr. 48:20-49:3. Simblist (and other faculty members), as admins of the closed group, had full ability and authority to remove Cherry's false and inflammatory post from the Facebook closed group, and the comments on that post, both before and after EAS exonerated Tapia, but chose not to.

Defendants' callousness in their treatment of Tapia is stunning. Although the November 6 faculty letter, Exhibit 7, names "Javier Tapia" and accuses him of "an act of racial bias" and "implicit prejudice," Tapia's accusers had no evidence to support their accusations. Exhibit 6 (Inman Dep.) at 37:25-38:8. Inman testified that she signed the letter out of "fear of being seen as complicit or potentially racist myself if I don't participate in signing this letter… or my choice not to participate in the protest that happened." *Id*. at 65:24-66:3. Director of Graduate Studies Cara Benedetto, who also signed the faculty letter, has been a colleague of Tapia's for four years. Exhibit 10 (Benedetto Dep.) at 12:23-24, seeing him "once a week." *Id*. at 13:8. She does not recall anything Tapia ever said or did that she believed to be racially inappropriate. *Id*. at 13:9-13. Other than Simblist's October 28 email to the department, Benedetto had no information about the October 25 incident. *Id*. at 14:12-18; 16:6-12. She nevertheless "agreed with all parts of the letter." *Id*. at 19:23. Asserting, "[t]here's a history of incidences [sic] in our department," she admitted, "I don't have facts." *Id*. at 30:25-31:3. She calls Tapia's conduct on October 25 "an act of racial bias," *Id*. at 33:16-21, but she is unable to explain why. *Id*. at 34:23-35:2; 37:10-21; 37:18-20. ("Q: You're accusing Javier Tapia of racism, and you're telling now for 25 minutes, you have no facts? A: I have no facts.") And yet, she signed the letter, she endorsed it fully, all of it, and she published it. *Id*. at 36:8-14.

On December 18, 2018, VCU took Tapia off the teaching schedule for the following spring semester. Exhibit 11. Simblist created the schedule. Exhibit 10 (Benedetto Dep.) at 55:2-7. It was unusual for a full-time faculty member not to be on the schedule. *Id*. at 55:24-56:3. In April of

2019, Benedetto posted a picture on Instagram. *Id*. at 56:19-57:3; 57:12-13. The photograph depicts a t-shirt that states, "I SUE VCU 1 MILLION DOLLARS." Exhibit 12 (Benedetto Dep. Exhibit 5). It is "a design that Caitlin Cherry and [Benedetto] collaborated on. It's art. It's a t-shirt." Exhibit 10 (Benedetto Dep.) at 57:16-19. The back of the t-shirt depicts a heart, the letters JT, and an island with two palm trees. Exhibit 13 (Benedetto Dep. Exhibit 6); Exhibit 10 (Benedetto Dep.) at 59:6-18. The initials "could be JT for Javier Tapia," Exhibit 10 (Benedetto Dep.) at 59:21, and were "meant to be understood at least by some as a reference to Javier Tapia." *Id*. at 60:4-6. On May 1, 2019, Benedetto attended a student protest against Tapia's return to teaching in the fall. *Id*. at 62:25-63:2. Benedetto was supporting the students. *Id*. at 64:4.

In the spring of 2019, Inman posted on Instagram, "Prof. Javier Tapis [sic] haa [sic] been allowed to return to VCU in Fall 2019." Exhibit 14 (Inman Dep. Ex. 3). Inman also assisted in the printing of the t-shirts. Exhibit 6 (Inman Dep.) at 76:4-14.

On June 13, 2019, Benedetto gave her deposition. One day earlier, June 12, 2019, she posted on Instagram pictures of the actress Sharon Stone from the movie "Basic Instinct"[5] and captioned the pictures as "Depo Prep." Exhibit 10 (Benedetto Dep.) at 8:10-19; Exhibits 15 and 16. Covering Ms. Stone's genital area is a fist in one picture and an obscene gesture in the other. *Id.* Benedetto testified that these pictures were "art." Exhibit 10 at 8:21.

Whereas the VCU Defendants disciplined Tapia for not knowing his colleague Caitlin Cherry, neither Inman nor Benedetto nor Cherry has been disciplined for their treatment of Tapia

---

[5] In the film, Sharon Stone plays Catherine Tramell, a woman suspected of murder, who, in one scene, is interrogated by the police. In a gesture of insouciance, Ms. Tramell uncrosses her legs, thereby showing she is wearing no underwear and flashing her genitals to the police and the audience. The picture posted on Instagram by Benedetto is of Catherine Tramell uncrossing her legs.

or for their mocking, utter contempt for his involvement in these legal proceedings. Exhibit 29 (Tapia Decl.) at ¶¶ 2, 4.

Defendants' motion is based on a highly sanitized record. Instead of quoting from their deposition testimony, Defendants Brixey and Simblist and VCU attorney Jake Belue point to their respective post-deposition Declarations. Defendants' motion does not rely on words they *said*, but words they *wished* they had said. When asked in his deposition whether he had made any edits to Simblist's October 28, 2018 email[6] to the PAPR department, Brixey stated, "Yes, I think so." Exhibit 17 (Brixey Dep.) at 11:8-10. Simblist confirmed Brixey's involvement. When asked what he and the Dean talked about on October 28, he responded, "So I was asking for some sort of approval to craft any form of message. And he was talking about checking into that and what that might involve." Exhibit 1 (Simblist Dep.) at 27:15-28:1.[7] In his Declaration, however, Brixey now denies any involvement at all and swears, "I did not draft or approve Simblist's 'open letter' email dated October 28, 2018." Def. Exhibit 9 (Simblist Decl.) at ¶ 5.

Defendants simply change the facts when they prove inconvenient. On November 19, 2018, Defendant Brixey instructed Tapia as follows:

> While on administrative leave, you are to have **no contact of any kind** with any VCU faculty, staff, or students. Contact includes in-person contact, telephone calls, text messages, emails, Facebook, Twitter, or other forms of messaging or social media contacts.  If you or someone acting on your behalf initiates any contact with any VCU or VCU faculty, staff, or students in violation of this directive, you may be subject to additional administrative action by the university administration.

Exhibit 3 (November 19 letter) (emphasis added).

In Defendants' motion, however, this "no-contact-of-any-kind" instruction has been watered down: "At all times I intended and understood that the November 19, 2018 letter only

---

[6] Exhibit 18 (Exhibit 1 to Brixey deposition).
[7] See also Exhibit 19 (Simblist interview) at 8. ("I spoke to [Brixey] five times on Sunday … [Brixey] then texts me to say, 'The Provost has approved the draft of your internal email...'").

related to work-related conduct, including work-related conversations." Def. Exhibit 9 (Brixey Decl.) at ¶ 6. Defendants similarly dilute Simblist's email of October 26, 2018, in which Simblist wrote: "Caitlin Cherry, an African American woman who is an adjunct teaching MFA students for PAPR was (in my opinion) **racially profiled and inappropriately criminalized yesterday by Javier Tapia**…" Exhibit 4 (Emphasis added). Defendants paraphrase this accusation to be that Simblist was merely "explaining 'in his opinion,' what he understood to have happened on the previous morning," Def. Mem. at 5, ¶ 11.

In similar fashion, setting up their mootness argument, Defendants now assert as "undisputed that the temporary administrative leave issued on the evening of November 19, 2018 was lifted on February 15, 2019," Def. Mem. at 12, when, in fact, VCU instructed Tapia May 20, 2019, that "[p]rior to the start of fall semester, you **must** review VCU's Code of Conduct…" and "required [him] to meet for three hours of diversity/leadership coaching with Dr. Susan Wilkes, Ph.D." Exhibit 20. Contrary to Defendants' "undisputed facts," Tapia has not "been fully restored all the rights and privileges of a tenured professor at VCU," Def. Mem. at 3, ¶ 3, or "since been returned to his full duties," *id.* at 15. VCU has set conditions for his return to teaching. These conditions are ongoing; they did not merely "occur[] in the past." *Id*. at 12.

In the same vein, Defendants now claim that their November 19, 2018, letter "does not state that Tapia was not allowed to be on VCU property; it states only that Tapia was to get prior permission before doing so…" *Id*. at 16. Defendants propose that their interpretation of the letter makes it "a reasonable request in light of the protests and disruptions that centered on Tapia at this time." *Id.* The letter, instead, stated, "you are not permitted on university property or in any of its buildings or facilities." Exhibit 3 (November 19 letter).

Defendants completely ignore their own responsibility for "the protests and disruptions that centered on Tapia" during the week of Thanksgiving and thereafter.

8

**FACTS THAT PRECLUDE JUDGMENT FOR THE DEFENDANTS**

1.      On October 26, 2018, Simblist concluded, "Caitlin Cherry, an African American woman … was … racially profiled and inappropriately criminalized yesterday by Javier Tapia…" Exhibit 4. VCU administrators reminded Brixey on November 17, 2018 that Simblist's "bias of the incident may have caused some of [the protests and disruptions]." Exhibit 21.

2.      When, after three agonizing weeks, VCU finally exonerated Tapia on Friday, November 16, 2018, Exhibit 22. Defendant Brixey immediately prohibited Tapia from talking about the fact that EAS had cleared him, on pain of "termination from employment." Exhibit 3.

3.      Within an hour and a half after Caitlin Cherry had her encounter with Tia Harris, the unarmed African American security guard, Cherry created a Facebook post that mimicked a "marked safe" Facebook message.[8] Exhibit 8 (Cherry Dep. ) at 53:5-14. Cherry used a so-called "meme generator," an online graphic design application, to put together a message that featured a picture of Tapia and the text, "Caitlin Cherry marked himself safe during Old White Male Associate Professor that called Security on Young Black Female Adjunct for Sitting in her Own Classroom Incident." *Id.* The post appeared, among other places, in a Facebook closed group named "VCUarts Painting and Printmaking" that had been created by Brennen Perry, an alumnus of the VCU School of the Arts. Exhibit 9 (Brennen Perry Dep.) at ____.

4.      Perry is a volunteer "admin" of the "VCUarts Painting and Printmaking" closed group, as is the Defendant Noah Simblist, and other faculty members such as Brooke Inman. Exhibit 9 (Brennen Perry Dep.) at ____. In addition, the VCU Painting and Printmaking Department lists itself as a group "admin" and the closed group is linked to the department's

---

[8] See, supra, n. 1.

Facebook page,[9] "VCUarts Painting + Printmaking." *Id.* at ____. A group's "admin" has the power to, among other things, approve or deny posts in the group and remove posts and comments on posts.[10] *Id.* at ____

5.      Simblist knew that Cherry was posting statements about Tapia and her complaints of alleged discrimination on the closed Facebook group. Exhibit 4; *see also* Exhibit 1, (Simblist Dep.) at 48:20-49:3. Simblist (and other faculty members), as admins of the closed group, had full ability and authority to remove Cherry's false and inflammatory posts from the Facebook closed group, both before and after EAS exonerated Tapia, but did not do so. Exhibit 9 (Brennen Perry Dep.) at ____. On November 28, 2018, Simblist announced that he had promoted Cherry to Full Time Assistant Professor of Art and that her appointment would last until May 2020. Exhibit 23 at p. 2. Upon Simblist's recommendation, Brixey made the decision to hire Cherry full-time. Exhibit 1 (Simblist Dep.) at 125:19-126:13.

6.      Three weeks later, on December 18, 2018, VCU announced that Tapia would not be teaching in the spring 2019 semester. Exhibit 11.

7.      On December 28, 2018, Tapia filed his Complaint in this Court. (ECF # 1). Tapia sent a courtesy copy to VCU's inhouse counsel. Exhibit 25 (Belue Dep.) at 117:2-5.

8.      After the lawsuit was filed, any official communications from the School of Arts were reviewed by VCU's legal department. *Id.* at 119:6-9.

9.      On January 3, 2019, Brixey sent a letter to Tapia, "to clarify any misunderstanding." Exhibit 26.

10.      On February 15, 2019, Brixey issued a "Preliminary Counseling Memorandum" to Tapia. Exhibit 27. Brixey disciplined Tapia for three asserted reasons: first, Tapia "failed to stay

---

[9]  See, *supra*, n. 2 and 3.
[10] See, *supra*, n. 4.

abreast of the identity of [his] fellow colleagues in the department…" *Id.* at 1. Second, Tapia "approached [the October 25] situation with unwarranted and disproportionate suspicion, referring to, among other things, 'pipe bombs.'" *Id.* Third, Brixey accused Tapia of providing "false statements during the investigation," citing to Exhibit 22, EAS Finding of Facts ¶ 17. *Id.*

11.     Except for Tapia, VCU has never disciplined a tenured Professor for not knowing his or her colleagues. Exhibit 5 at p.12. VCU did not discipline Cherry for not knowing Tapia. Exhibit 29 (Tapia Decl.) at ¶ 3.

12.     Tapia did not refer to pipe bombs in his interaction with the campus security officer. *Id.*

13.     There is nothing in paragraph 17 of the EAS Report about intentional false statements. Exhibit 22, EAS Finding of Facts ¶ 17.

14.     By the February 15 letter, Brixey lifted Tapia's administrative leave, but imposed additional conditions precedent to Tapia's return to teaching. By that letter, Brixey required Tapia to "complete prior to the start of the next semester approved training related to your employment, to include training on VCU's policies and goals, the VCU Creed, professionalism and professional responsibilities as related to the workplace, and/or VCU's Standards of Conduct." In addition, Brixey required Tapia, prior to returning to campus, to "schedule a meeting with Dr. Gypsy Denzine … to review the logistics of your return, discuss what training will be made available, and to discuss how we may work together to avoid or limit any disruption or conflict that may result as you return to the workplace." Exhibit 27 at 2.

## MATERIAL FACTS THAT ARE IN DISPUTE

1.     Defendants' STATEMENT OF UNCONTESTED MATERIAL FACTS ¶ 2 misstates the evidence cited therein. VCU's administrative ban has not been lifted. On May 20, 2019, VCU sent a letter to Tapia. Exhibit 20. The letter outlines CONDITIONS for Tapia's return to teaching, based

on a "counseling memorandum" Defendant Brixey had sent to Tapia on February 15, 2019. *Id.* (citing Exhibit 27). VCU instructed Tapia, that "[p]rior to the start of fall semester, you **must** review VCU's Code of Conduct…" Exhibit 20 (emphasis added). Secondly, before being permitted to return in the fall semester, Tapia is "required to meet for three hours of diversity/leadership coaching with Dr. Susan Wilkes, Ph.D." *Id.*

2.      Defendants' STATEMENT OF UNCONTESTED MATERIAL FACTS ¶ 3 misstates the evidence cited therein. Tapia has not been fully restored all the rights and privileges of a tenured professor at VCU. VCU has set conditions for his return to teaching. *Id.*

3.      Defendants' STATEMENT OF UNCONTESTED MATERIAL FACTS ¶ 5 misstates the evidence cited therein. EAS conducted an inquiry that did, indeed, clear Tapia's name on Friday, November 16, 2018. However, on Monday, November 19, 2018, Defendant Brixey prohibited Tapia from talking about the fact that EAS had cleared him, on pain of "termination from employment." Exhibit 22.

4.      Defendants' STATEMENT OF UNCONTESTED MATERIAL FACTS ¶ 6 is irrelevant. The assertion that Tapia, a non-lawyer, may not realize that Defendants are currently violating his rights, does not exonerate Defendants. As shown *supra* at ¶¶ 1, 2, Tapia has not been fully restored all the rights and privileges of a tenured professor at VCU. VCU has set conditions for his return to teaching. These conditions constitute a current violation of Tapia's constitutional rights.

5.      Defendants' STATEMENT OF UNCONTESTED MATERIAL FACTS ¶ 7 contains allegations not anchored in the record and contrary to the legal standard of FRCP 56. The "closed group" *did* include VCU faculty. Exhibit 4 (Inman Dep.) at 59:3-7. ("Yes, … there's two Facebook groups. One is a private group, and one is a public group. And I am part of both of those."). Defendant Noah Simblist and the VCU Painting and Printmaking Department are also listed as "admin" of the closed group. Exhibit 9 (Brennen Perry Dep. ) at ____. Further, the assertion that

"Elizabeth Axtman … has no affiliation with VCU," has no evidentiary support.[11]

6.      Defendants' STATEMENT OF UNCONTESTED MATERIAL FACTS ¶ 11 misstates and sanitizes the evidence cited therein. Simblist did not abstractly express his opinion "what he understood to have happened on the previous morning." Instead, he wrote, "Caitlin Cherry, an African American woman who is an adjunct teaching MFA students for PAPR was (in my opinion) **racially profiled and inappropriately criminalized yesterday by Javier Tapia**…" Exhibit 4 (Emphasis added).

7.      Defendants' STATEMENT OF UNCONTESTED MATERIAL FACTS ¶ 12 contains misleading editorializing statements by Defendants' counsel.

a.      Simblist's open letter to PAPR students, faculty and staff did not contain Tapia's name, but not because Simblist was concerned about revealing Tapia's identity. Among the over 150 recipients of his email, Exhibit 1 (Simblist Dep.) at 31:21-22, there were many who already knew that the incident had involved Caitlin Cherry and Javier Tapia. *Id.* 32:9-33:4.

b.      The assertion that "Tapia testified that he had no evidence that Brixey played a role or approved the text of that letter," is also misleading and contrary to the evidence. On Friday, October 26, 2018, Simblist had five conversations with Brixey, urging him to build a communication strategy regarding the Tapia-Cherry incident. *Id.* 26:21-27:3. Simblist was "asking for some sort of approval to craft any form of message." *Id.* at 27:20-25. Simblist then "crafted a statement that the Provost's office … approved." *Id.* at 28:2-5. *See*

---

[11] "[T]he defendant cannot meet its burden merely . . . by argument of counsel." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255 n.9 (1981). "Statements by counsel, of course, are not evidence." *Wood ex rel. United States v. American Institute in Taiwan*, 286 F.3d 526, 534 (D.C. Cir. 2002). The law is clear that "a lawyer's musings … are not evidence." *Beckel v. Wal-Mart Assocs.*, 301 F.3d 621, 623 (7th Cir. 2002).

*also* Exhibit 20 (Simblist interview) at 8 ("I spoke to [Brixey] five times on Sunday about, basically as things were unfolding in real time. … I was strongly advocating that there be a communication strategy that would respond in some way. I was advocating to him ... that, that strategy needed to include an internal response to our students and faculty… I was requesting all of this. It was moving up the chain, all the way through the Provost's Office. [Brixey] then texts me to say, 'The Provost has approved the draft of your internal email, but only with two major changes.'")

8.     Defendants' STATEMENT OF UNCONTESTED MATERIAL FACTS ¶ 19 is disputed. Specifically, Plaintiff disputes the premise of Belue's statement "that [Tapia]s failure to know the identity of [Cherry] … had caused a significant disruption in the PAPR," and that "Tapia had been placed on administrative leave" because "VCU had an interest in bringing stability to an escalating situation." Tapia was not the cause of any significant disruption. He was innocent of the allegations of race discrimination and had been exonerated. Exhibit 22. Instead, the disruption to PAPR was caused by Cherry, who continued her unfounded accusations. VCU itself has admitted that Simblist's "bias of the incident may have caused some of [the protests and disruptions]." Exhibit 21. Faculty members who without any basis in fact published a letter accusing Tapia of "an act of racial bias" and "implicit prejudice," Exhibit 7, exacerbated the disruption. Brixey's November 19 decision to ban Tapia from campus and silence him, thus prohibiting Tapia from defending himself and informing his students of the EAS report, further contributed to the significant disruption on campus. Exhibit 3. Brixey and Simblist's decisions to hire Cherry full-time while simultaneously prohibiting Tapia from teaching in the 2019 spring semester, reinforced the students' misguided continuing belief that Tapia was guilty of racial bias.

9.     Defendants' STATEMENT OF UNCONTESTED MATERIAL FACTS ¶ 22 is disputed. Belue's November 20 email did not change any of the content of the November 19 letter. Exhibit

25 (Belue Dep.) at 53:18-22. ("Q.: So it's a change of the original letter, right? … A.: I would not say that it is a change from the original letter."). Belue was unable to explain what Defendant Brixey meant by the term "work-related activity." *Id*. 48:17-25. When Belue wrote that the November 19 letter should be read to curtail work-related activity, he meant "that his work-related activities would be suspended." *Id*. 61:14-18. When asked what he meant by the term "work-related conduct," Belue offered a circular explanation: "I meant, work-related conduct." *Id*. 61:21-22. For Tapia, "work-related" conduct was ninety percent of his life. Exhibit 24 (Tapia Dep.) at 144:10-11. ("And … it was even more confusing to me after I received this. When there is the word curtail work-related activity, for me work-related is ninety percent of my life, and so to me it didn't explain anything.").

15.     Defendants' STATEMENT OF UNCONTESTED MATERIAL FACTS ¶ 25 is disputed. In his January 3 letter, Defendant Brixey stated, "You are free to respond to any allegations brought against you related to your employment at VCU *within appropriate channels. Personnel issues, including management's review of your employment status and the investigation of allegations made against you should remain confidential and only discussed within the appropriate supervisory/need-to-know chain."* Exhibit 16 at 1 (emphasis added). Brixey did not define the term "appropriate channels". *Id*.; *see also* Exhibit 15 (Belue Dep.) at 105:2-22 ("Q.: Is CNN one of the appropriate channels you're pointing him towards? A.: [T]he only thing I would say in response is it's a fair question."). According to the January 3 letter, Tapia was not free to engage in teaching, research and service while on administrative leave. *Id*. 113:16-19 ("[T]o the extent that [] teaching, research and service are his duties as a faculty member, he was not free to engage in that work-related conduct."). Tapia's duties as an art professor include three areas, teaching, research and service. Exhibit 28 (Simblist FRCP 30(b)(6) deposition) at 8:11-12. Tapia's "research" includes exhibitions, lectures, publications, performances, curatorial work, work within

15

the field of artistic practice. *Id.* at 8:19-21.

16.     Defendants' STATEMENT OF UNCONTESTED MATERIAL FACTS ¶ 27 is disputed. The February lift of the ban was conditional. Exhibit 17.

17.     Defendants' STATEMENT OF UNCONTESTED MATERIAL FACTS ¶ 29 is disputed. EAS conducted an inquiry that did, indeed, clear Tapia's name on Friday, November 16, 2018. However, on Monday, November 19, 2018, Defendant Brixey prohibited Tapia from talking about the fact that EAS had cleared him, on pain of "termination from employment." Exhibit 9.

10.     Defendants' STATEMENT OF UNCONTESTED MATERIAL FACTS ¶ 32 is disputed. When asked in his deposition whether he had made any edits to Simblist's October 28, 2018 email[12] to the PAPR department, Brixey stated, "Yes, I think so." Exhibit 17 (Brixey Dep.) at 11:8-10. Simblist confirmed Brixey's involvement: "So I was asking for some sort of approval to craft any form of message. And he was talking about checking into that and what that might involve." Exhibit 1 (Simblist Dep.) at 27:15-28:1.

## **LEGAL ARGUMENT**

### I.     **SUMMARY JUDGMENT STANDARD WITH RESPECT TO CLAIMS OF QUALIFIED IMMUNITY.**

In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. *Tolan v. Cotton*, 572 U.S. 650, 655 (2014). The first asks whether the facts, taken in the light most favorable to the party asserting the injury, show the defendant's conduct violated a federal right. *Id.* at 656 (internal citations and quotations omitted). The second prong of the qualified-immunity analysis asks whether the right in question was "clearly established" at the time of the violation. *Id.* Courts have discretion to decide the order in which to engage these two

---

[12]  Exhibit 18 (Exhibit 1 to Brixey deposition).

prongs, but under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment. *Id*. (citations omitted). As in any motion for summary judgment, a court must view the evidence "'in the light most favorable to the opposing party.'" *Id*. at 657, quoting *Adickes v. S. H. Kress & Co*., 398 U. S. 144, 157 (1970).

With respect to motions for summary judgment based upon claims of qualified immunity, the Fourth Circuit has held that if "'a dispute of material fact precludes a conclusive ruling on qualified immunity at the summary judgment stage, the district court should submit factual questions to the jury and reserve for itself the legal question of whether the defendant is entitled to qualified immunity on the facts found by the jury.'" *Yates v. Terry*, 817 F.3d 877, 882 n.2 (4th Cir. 2016), quoting *Willingham v. Crooke*, 412 F.3d 553, 560 (4th Cir. 2005); *see Day v. Young,* 2016 U.S. Dist. LEXIS 140030, at *19 (E.D. Va. Oct. 6, 2016).

Whether the Defendants are entitled to qualified immunity in this case will depend upon a resolution of a question of fact regarding the November 19 letter.

In that letter, there can be no real dispute that Brixey's prohibition against "contact of any kind with any VCU faculty, staff, or students" is an overbroad prior restraint of Tapia's First Amendment rights. The Defendants, however, aver that the November 19 letter is not a prior restraint because "no contact of any kind" means and always has meant "work-related conversations," which, Defendants argue, are fair game. (Def. Exh. 9 at ¶ 6.) "No contact of any kind" does not contemplate any exception to the rule, while "work-related conversations" contemplates many exceptions. The written statement and Brixey's gloss on it have different meanings.

When a writing is susceptible of two meanings, it is ambiguous. *Nehi Bottling Co. v. All-American Bottling Corp*., 8 F.3d 157, 161 (4th Cir. 1993). When there is a dispute as to the meaning of an ambiguous term, as here, the issue of the proper meaning is one for the jury. *Mgmt. Sys.*

17

*Assocs., Inc. v. McDonnell Douglas Corp.*, 762 F.2d 1161, 1173 (4th Cir. 1985). Whether the Defendants are entitled to qualified immunity on the prior restraint issue is a question that is therefore properly reserved until the jury has decided the extent of the restraint in the November 19 letter.

## II.     THE DEFENDANTS ARE NOT OTHERWISE ENTITLED TO QUALIFIED IMMUNITY

The critical issue before the Court on qualified immunity is whether the constitutional violations alleged here involve violations of law that was clearly established. The controlling legal principles have been established at least since the Supreme Court's decision in *Healy v. James*, 408 U.S. 169 (1972), a case also involving a prior restraint issued by university officials. In restricting Tapia's freedom of expression and freedom of expressive association within the VCU Community, VCU's prior restraint infringed on long-established First Amendment rights applicable in the setting of state universities. As the Supreme Court explained in a university case implicating such expressive and associational rights, "Among the rights protected by the First Amendment is the right of individuals to associate to further their personal beliefs. While the freedom of association is not explicitly set out in the Amendment, it has long been held to be implicit in the freedoms of speech, assembly, and petition." *Healy*, 408 U.S. at 183, *citing Baird v. State Bar of Arizona*, 401 U.S. 1, 6 (1971); *NAACP v. Button*, 371 U.S. 415, 430, (1963); *Louisiana ex rel. Gremillion v. NAACP*, 366 U.S. 293, 296 (1961); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) (Harlan, J., for a unanimous Court).

These principles were deemed clearly established by the Fourth Circuit in 2011, in *Adams v. Trustees of the University of N.C.-Wilmington*, 640 F.3d 550, 563-64 (4th Cir. 2011). Referencing the "range of issues that arise in the unique genre of academia," *id.* at 564, the Fourth Circuit held that this right of a professor to speak on matters of public concern "*is clearly*

18

*established and something a reasonable person in the Defendants' position should have known was protected*." *Id.* at 566 (emphasis added). The Fourth Circuit in *Adams* specifically embraced the views of Justice David Souter, quoting with approval Justice Souter's statement: "I have to hope that today's majority does not mean to imperil First Amendment protection of academic freedom in public colleges and universities, whose teachers necessarily speak and write 'pursuant to ... official duties.'" *Id.* at 564, *quoting Garcetti v. Ceballos*, 547 U.S. 410, 425 (Souter, J., dissenting).

The VCU Defendants erroneously maintain that Tapia must demonstrate that they subjectively knew they were violating Tapia's rights. See VCU Defendants Memorandum at 25 (stating: "Tapia has not and cannot establish that Brixey knew that he was violating Tapia's clearly established rights.") As the Fourth Circuit strongly emphasized in its opinion in *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc), the standard for qualified immunity is *not* subjective, but objective. ("[I]t is not the honesty of Purnell's intentions that determines the constitutionality of his conduct; rather it is the objective reasonableness of his actions.") *Id.* at 532.

## III.   TAPIA'S CLAIMS ARE NOT BARRED BY THE ELEVENTH AMENDMENT

Tapia's claims for declaratory and injunctive relief against the VCU Defendants, sued in their official capacity for violation of Tapia's constitutional rights, fall squarely within the exception to Eleventh Amendment recognized in *Ex Parte Young*, 209 U.S. 123 (1908). "This doctrine has existed alongside our sovereign-immunity jurisprudence for more than a century, accepted as necessary to 'permit the federal courts to vindicate federal rights.'" *See, e.g.*, *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254-55 (2011). While a grant of declaratory or injunctive relief against the VCU Defendants will in an abstract sense encroach on the sovereignty of the State, that is true of *all* claims for declaratory and injunctive relief brought to

vindicate First Amendment or Fourteenth Amendment rights, and thus is simply an assertion that "applies to every *Ex Parte Young* action." *Antrican v. Odom*, 290 F.3d 178, 188-89 (4th Cir. 2002). Tapia's claims for injunctive and declaratory relief seek no retrospective monetary damages relief against the Commonwealth, and for that reason fall squarely within the exception to the Eleventh Amendment recognized in *Ex Parte Young*. *Id.* at 189; *CSX Transp., Inc. v. Bd. of Pub. Works of State of W.Va.*, 138 F.3d 537, 540 (4th Cir. 1998); *Green v. Mansour*, 474 U.S. 64, 68, 10 (1985).

The VCU Defendants invoke precedents that have nothing to do with suits such as Tapia's seeking injunctive and declaratory relief under § 1983 and the Constitution, but instead involve the entirely distinct question of whether Congress may abrogate the sovereign immunity of the states by passing federal legislation pursuant to Congress' Article I powers, such as the Commerce Clause. *See* VCU Defendants Memorandum at 11, citing *McCray v. Md. Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014); *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 363-64, (2001). This line of cases emanates from the Supreme Court's decision in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 59 (1996), which held that Congress may not abrogate the immunity of the states when it acts pursuant to its Article I powers, in contrast to when it acts pursuant to the Fourteenth Amendment. *Seminole Tribe* explicitly explained that it was *not* altering Eleventh Amendment immunity with regard to constitutional claims against states brought under the Fourteenth Amendment or congressional enforcement of the Fourteenth Amendment. *Id.; see also Fitzpatrick v. Bitzer*, 427 U.S. 445, 452–56, (1976). As the Supreme Court has constantly reiterated, "Our precedents do teach us, nevertheless, that where prospective relief is sought against individual state officers in a federal forum based on a federal right, the Eleventh Amendment, in most cases, is not a bar." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 276-7 (1997).

Finally, the assertion by the VCU Defendants that Tapia's claims are barred by the Eleventh Amendment because the alleged constitutional violations were entirely "in the past" miscomprehends the facts and the law. When Tapia brought this suit, the alleged constitutional violation was *not* in the past, but present and ongoing. That makes this case entirely different from *DeBauche v. Trani*, 191 F.3d 499, 505 (4th Cir. 1999), upon which the VCU Defendants rely, in which the alleged constitutional violation occurred "*entirely* in the past." *Id.* (emphasis added). When Tapia brought this suit the prior restraint against him was in full force, and it remained in full force until many months after this case was filed. To this day, Tapia's return to teaching is based on the condition that "[p]rior to the start of fall semester, you **must** review VCU's Code of Conduct…" Exhibit 20 (emphasis added). Secondly, before being permitted to return in the fall semester, Tapia is "required to meet for three hours of diversity/leadership coaching with Dr. Susan Wilkes, Ph.D." *Id.* Thus the Eleventh Amendment plainly did not bar the suit when filed. At that point, an entirely different body of law kicked in, the body of law dealing with mootness and the time-honored principle that a defendant's voluntary cessation of impermissible activity does not render a case moot or deprive a federal court of jurisdiction. Those principles, which were previously presented to this Court in other motions, deserve reiteration here.

The VCU Defendants' argument is an afront to the rule that "[i]t is well established that a defendant's 'voluntary cessation of a challenged practice' moots an action only if 'subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 189 (2000). Courts should be wary of maneuvers that seek to avoid judicial resolution of legally indefensible yet repeatable behavior. As the Supreme Court warned in *Knox v. Service Employees International Union, Local 1000*, 567 U.S. 298 (2012), "[s]uch postcertiorari maneuvers designed to insulate a decision from review by this Court must be viewed with a critical

eye." *Id.* at 308. The Court in *Knox* refused to treat the case before it as moot, and this Court should do the same. "The voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." *Id.* Were it otherwise, "courts would be compelled to leave '[t]he defendant ... free to return to his old ways.'" *City of Mesquite v. Aladdin's Castle*, 455 U.S. 283, 289 n. 10 (1982), *quoting United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953).

The VCU Defendants wrongly rely on precedents holding that the repeal of a challenged *statute* may render a case moot. *See Valero Terrestrial Corp. v. Paige*, 211 F.3d 112, 116 (4th Cir. 2000). (statutory changes that discontinue a challenged practice are "usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed.") The repeal of a statute, however, is fundamentally different from a reversal of an *ad hoc* administrative order. The repeal of formal statutes involves a complex political machinery replete with solemnity and finality of a character entirely distinct from summary orders issued by administrative officials. The prior restraint issued against Tapia was instituted by administrative *fiat*, with no due process or warning, at the whim of the VCU Defendants. There is nothing to prevent the VCU Defendants from reissuing the prior restraint against Tapia, without warning or due process, as they did in November 2018. In the absence of injunctive relief, there is no legal impediment to prevent the VCU Defendants from returning to their "old ways." *Mesquite*, 455 U.S. at 283, n. 10.

The VCU Defendants suggest that their lifting of the prior restraint against Tapia deprives this Court of the judicial power to grant Tapia injunctive relief under Article III of the Constitution. This is erroneous. "A case becomes moot only when it is impossible for a court to grant 'any effectual relief whatever" to the prevailing party.'" *Knox*, 567 U.S. at 307, *quoting Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000), *quoting in turn, Church of Scientology of California v. United*

*States*, 506 U.S. 9, 12, (1992), *quoting in turn, Mills v. Green*, 159 U.S. 651, 653 (1895)). "[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Ellis v. Railway Clerks*, 466 U.S. 435, 442 (1984). VCU's back-tracking plainly does *not* deprive this Court of Article III power to grant relief:

> It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. Such abandonment is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice, but that is a matter relating to the exercise rather than the existence of judicial power.

*Mesquite*, 455 U.S. 283, 289 (1982). "The 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Wall v. Wade*, 741 F.3d 492, 497 (4th Cir. 2014). The VCU Defendants cannot meet this "heavy burden," because the mere possibility of *reinstatement* of an unconstitutional policy is enough, on its own, to pretermit application of the mootness doctrine. As the Fourth Circuit explained in *Wall v. Wade*, "We have no difficulty concluding that the defendants failed to meet their "heavy burden" of establishing that it is "absolutely clear" the 2010 Ramadan policy will not be reinstated." *Id.* at 497.

- This in turn implicates the second line of precedent upon which Tapia relies, the notion that the Court ought not refrain from exercising its prerogative to declare the actions of the VCU Defendants likely to be found unconstitutional merely because of litigation assertions that they will avoid future constitutional obligations in the exercise of their *noblesse oblige*. *United States v. Stevens*, 559 U.S. 460, 480 (2010) ("But the First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*."). Just as the Fourth Circuit declared in *Wall v. Wade*, "Unsubstantiated assurances in their appellate brief aside, the defendants have failed to put forth even a single piece of

23

evidence establishing that the practice of requiring physical indicia of faith has been terminated once and for all." *Wall v. Wade*, 741 F.3d at 497. As this Court recognized in *Boston Correll v. Herring*, 212 F. Supp. 3d 584 (E.D. Va. 2016) (Payne, J.), one critical factor to consider is past enforcement against the plaintiff. Having done it before, VCU could do it again.[13] *Id.* at 601 (past enforcement against the plaintiff may make chilling effect objectively reasonable), *citing Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) (history of past enforcement "most obvious[]" evidence of chilling effect). In sum, Tapia's claims for injunctive relief are not moot.

## IV.   TAPIA HAS STATED VIABLE DUE PROCESS CLAIMS

### A.   Tapia Has Stated a Viable Liberty Interest Claim

The VCU Defendants completely ignore the prior authorities submitted to this Court to refute the positions they have previously taken. Tapia is thus forced to restate them here.

### 1.   Defendants' "Same Official" Argument is Erroneous

To begin, the VCU Defendants again misstate the law in asserting, "a 'stigma plus' claim requires that the same government official be responsible for both the action depriving the plaintiff of a liberty interest (the plus), as well as the statement harming the plaintiff's reputation (the stigma.) VCU Defendants Memorandum at 20. This is simply not a correct statement of the law, and the authority cited by the VCU Defendants does not support the proposition.

The VCU Defendants wrongly cite as support *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 10 (1st Cir. 2011). The closest the *URI Student Senate* opinion comes is a statement

---

[13] This especially true in light of VCU's continuing misguided insistence "that [Tapia]s failure to know the identity of[Cherry] … had caused a significant disruption in the PAPR," and that "Tapia had been placed on administrative leave" because "VCU had an interest in bringing stability to an escalating situation." Defendants' STATEMENT OF UNCONTESTED MATERIAL FACTS ¶ 19

that requires that the *source* be the same, noting that this is true even if both sources are

*governmental entities*:

> Where the stigma and the incremental harm—the "plus" factor—derive from
> distinct sources, a party cannot make out a viable procedural due process claim.
> *See, e.g., Hawkins v. R.I. Lottery Comm'n*, 238 F.3d 112, 116 (1st Cir.2001). That
> is true even if both sources are government entities.

*URI Student Senate*, 631 F.3d at 10. An examination of the *Hawkins* decision, cited internally in

the passage above, held that no liability existed for a termination of an employee by a state lottery

commission when the stigmatizing came from the state's Governor:

> Here, though the defendants are all representatives of the state, the state is not a
> party. The only specific allegations of defamation refer to statements by the
> governor, while the termination was at the will of the Lottery Commission, which
> by law is fiscally and operationally autonomous.

*Hawkins*, 238 F.3d at 115-16. In short, the argument made by the VCU Defendants that the

Constitution requires that the same government official be responsible for both the "stigma" and

the "plus" is an overstatement of the law. The idea that the VCU Defendants can somehow blame

Simblist for the "stigma" and Brixey for the "plus" and thus avoid liability is self-evidently absurd.

If the government could avoid responsibility for violating the Constitution through such reciprocal

divide-and-conquer finger-pointing, no plaintiff victimized by such action would ever be able to

obtain redress. As explained by the Second Circuit:

> Though we have never directly addressed the question, other circuits have approved
> of "stigma-plus" claims in which the "plus" was imposed separately from any
> explicit stigmatizing statement. . . . Thus, it would seem that, even where a "stigma"
> and "plus" are not imposed by the same actor, a stigma-plus claim may be valid if
> the "stigma" and "plus" were connected. . . . We now hold that perfect parity in the
> origin of both the "stigma" and the "plus" is not required to state the infringement
> of a "stigma-plus" liberty interest.

*Velez v. Levy*, 401 F.3d 75, 88–89 (2d Cir. 2005). It is worth noting that the Court in *Velez* explicitly

noted that the decision in *Hawkins* "is not to the contrary." *Velez*, 401 F.3d at 90. The Court

25

emphasized the complete disconnection between the government sources in *Hawkins*, compared to the proximate connection in *Velez*. *Id.*

### 2.      The "Stigma" Requirement is Easily Satisfied

As to the "stigma" element of his claim, Tapia easily satisfies it here. that the actions of the VCU Defendants defaming and branding Tapia as a racist who engaged in "racial profiling" and who "criminalized" Caitlyn Cherry, making Tapia a sacrificial lamb, constitutes a textbook example of a valid "stigma plus" liberty-interest claim in violation of the Due Process Clause. "Indeed, the Supreme Court long ago made clear that a liberty interest is implicated '[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him.'" *Doe v. Rector & Visitors of George Mason University*, 132 F. Supp. 3d 712, 721 (E.D. Va. 2015), *quoting Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971) *See also Goss v. Lopez*, 419 U.S. 565, 575 (1975) (students' suspension implicated liberty interest because charges of misconduct "could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment."). Tapia has presented powerful evidence supporting his stigma-plus claim, implicating "(1) the liberty 'to engage in any of the common occupations of life,' and (2) the right to due process "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." *Sciolino v. City of Newport News,* 480 F.3d 642, 645–46 (4th Cir. 2007).

The "stigma" part of the test is akin to defamation. *Elhady v. Piehota*, 303 F. Supp. 3d 453, 464 (E.D. Va. 2017) (public dissemination of "defamatory information" will satisfy the stigma prong). Courts have recognized that the stigma requirement is satisfied by statements disclosed to the public that impugn a person's fitness or character in relation to his or her profession, or imply the existence of a serious character defect such as dishonesty, unethical conduct, or immorality. *See Ridpath v. Board of Governors Marshall University*, 447 F.3d 292, 308 (4th Cir. 2006),

26

*quoting Robertson v. Rogers*, 679 F.2d 1090, 1092 (4th Cir.1982), *citing Board of Regents v. Roth*, 408 U.S. 564, 573 (1972).

### 3. The "Plus" Requirement is Satisfied

The "plus" required to support Tapia's "sigma plus" claim need not rise to a protected *property interest.* If that were the law, the entire field of "stigma plus" due process violation claims would be swallowed by the "property interest" side of due process jurisprudence, since any viable "stigma plus" liberty-interest claim would already have to satisfy the requirements for a viable property-interest claim. The "plus" in the "stigma plus" test may thus be satisfied by less severe alterations in a plaintiff's status that might not rise to the level of deprivation of a property interest. It thus *does not matter* that throughout this saga, Tapia has been paid. Nor does it matter that throughout this saga, Tapia has been placed on leave, but not outright fired.

The key precedent guiding this Court is the Fourth Circuit's decision in *Ridpath*, in which the Court held that an officer of the athletic department at Marshall University stated a viable "stigma plus" claim even though he had been paid, and indeed *given a raise*, throughout the period, and had merely be assigned to a new position within the University. The Fourth Circuit rejected the assertion that the surface label the university assigned, "corrective action," was dispositive. VCU's use of a similar phrase, "administrative leave," is no more dispositive. The Fourth Circuit found that Ridpath had plausibly pleaded that he had been "banished" from the Marshall Department of Athletics, that he had been made a "scapegoat," painting "an ugly picture of the circumstances surrounding Ridpath's reassignment." *Ridpath*, 447 F.3d at 310. Tapia's predicament parallels Ridpath's. Tapia was also banished and made a scapegoat.

Finally, Tapia may satisfy the "plus" requirement by showing an abridgment of other First Amendment rights intertwined with VCU's actions shaming and defaming him. On this score, it is important to note that the "plus" required under the stigma-plus test can be satisfied by

stigmatizing statements that are intertwined with other free-standing constitutional deprivations, such as abridgment of freedom of speech. *Cooper v. Dupnik*, 924 F.2d 1520, 1532 n. 22 (9th Cir.1991) ("The 'plus' part of this test can be met by either the denial of a right specifically secured by the Bill of Rights (such as the right to free speech or counsel"). This is precisely what Tapia has claimed. (Complaint ¶¶ 65, 66). The limitations on Tapia's free speech and freedom of expressive association rights are the sorts of deprivation that have long been recognized as sufficient "plus" to satisfy the "stigma plus" test. *See Ridpath*, 447 F.3d at 310-11. So too, the stripping of his teaching responsibilities, the denial of his right to enter the VCU campus, the deprivation of his access to his "tools of the trade" as an artist and teacher are dramatic and highly stigmatizing alterations of his status as a tenured professor, constituting a free-standing "plus" interested protected by the Constitution. *Id.*

### B.      Tapia has a Viable Property Interest Claim.

Tapia has demonstrated a viable property interest claim. His summary banishment from the VCU campus violated the terms of his tenure contract with VCU. In *Garner v. Steger*, 69 F. Supp. 3d 581, 590 (W.D. Va. 2014), Judge Conrad held that a Virginia Tech professor had plausibly pled a deprivation of a property interest cognizable under the Due Process Clause when Virginia Tech transferred the professor to a new position with no reduction in pay. The court noted that determination of the existence of a property interest in the context of actions against a university professor requires a fact-intensive determination of the scope of the professor's property interest. *Id.* The court went on to determine "that the change in position here was a 'severe sanction' that could only be made for cause." *Id.* at 591, *citing Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Tenure is not a sterile right to a lifetime paycheck. Tenure contemplates reciprocal rights and responsibilities between the professor and the university. For a professor who has been tenured

since 1995 to suddenly be banned from his classroom, and artistic environment, denied use of his computer and all congress with his colleagues and students, is to eviscerate the very soul of the property interest that tenure protects.

**C.     Tapia Received No Process Whatsoever**

Tapia received no due process. The initial branding of him came within days after Cherry reported the incident, before any investigation by the VCU Defendants had yet transpired.  The subsequent issuance of the draconian prior restraint against him occurred immediately *after* he had been vindicated by VCU; its purpose was to silence him. The notion that Tapia had to request a hearing in advance for this arbitrary action that came from nowhere is absurd.

**D.     The Damage Caused by the Deprivation Implicates Disputed Facts**

The repeated refrain from the VCU Defendants that Tapia's damage from the Due Process violation stemmed from the actions of Cherry or others aligned with her, including VCU faculty members and students and outsiders, is not a sufficient basis for the grant of summary judgment. Tapia has demonstrated that at least *some* of the harm caused was the direct result of the actions of the VCU Defendants themselves. The apportionment of that harm involves disputed facts and cannot be decided on summary judgment. This also applies to the emotional distress caused to Tapia by the violation of his due process rights. *Carey v. Piphus*, 435 U.S. at 263-64. ("Finally, we foresee no particular difficulty in producing evidence that mental and emotional distress actually was caused by the denial of procedural due process itself. Distress is a personal injury familiar to the law, customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff.")

**CONCLUSION**

The undisputed record shows that a tranquil student body is of singular importance to the VCU Defendants. VCU evaluates student protests by their intensity, not by their justification in

fact. VCU will "stabilize" significant disruption by the students by acts designed to mollify the students' concern. The fact that the students' concern may be irrational or ill-informed is not part of VCU's equation. The innocence of Tapia, his exoneration and the total absence of any evidence of racial animus, if contrary to the beliefs of the student body, make no difference, and VCU will scapegoat or sacrifice its professor if such a step brings "stability to an escalating situation." Defendants' STATEMENT OF UNCONTESTED MATERIAL FACTS ¶ 19. The Defendants' Motion for Summary Judgment should be denied.

Respectfully submitted,

**JAVIER TAPIA**

By Counsel

_____/s/  Blackwell N. Shelley, Jr._____
Blackwell N. Shelley, Jr. (VSB # 28142)
Tim Schulte (VSB # 41881)
Shelley Cupp Schulte, P.C.
2020 Monument Avenue, First Floor
Richmond VA  23220
(804) 644-9700
(804) 278-9634 [fax]
shelley@scs-work.com
schulte@scs-work.com

_____/s/_____
Timothy E. Cupp (VSB # 23017)
Shelley Cupp Schulte, P.C.
1951 Evelyn Byrd Avenue, Suite D
Harrisonburg, VA  22803
(540) 432-9988
(804) 278-9634 [fax]
cupp@scs-work.com

_____/s/_____
Rodney A. Smolla (VSB # 32768)
4601 Concord Pike
Wilmington, Delaware 19803
(864) 373-3882
(804) 278-9634 [fax]
rodsmolla@gmail.com

30

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of June, 2019, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Kevin D. Holden, Esquire
Lindsey A. Strachan, Esquire
David E. Nagle, Esquire
Jackson Lewis P.C.
P.O. Box 85068
Richmond, VA  23285
kevin.holden@jacksonlewis.com
lindsey.strachan@jacksonlewis.com
david.nagle@jacksonlewis.com


_____/s/_____
Blackwell N. Shelley, Jr. (VSB # 28142)
Shelley Cupp Schulte, P.C.
2020 Monument Avenue, First Floor
Richmond VA  23220
(804) 644-9700
(804) 278-9634 [fax]
schulte@scs-work.com